No. 23-1787

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

### VIVINT, INC.,

*Appellant*

**v.**

### ADT LLC, ALARM.COM INC.,

*Appellees,*

APPEAL FROM THE PATENT TRIAL AND APPEAL BOARD OF THE
UNITED STATES PATENT AND TRADEMARK OFFICE
NO. IPR2021-01374 (U.S. PATENT NO. 7,956,739)
(Hon. Iftikhar Ahmed, Administrative Patent Judge)

**CORRECTED APPELLANT VIVINT, INC.'S OPENING BRIEF**

R. PARRISH FREEMAN
ERIC L. MASCHOFF
**MASCHOFF BRENNAN**
1389 Center Drive, Ste. 300
Park City, Utah 84098
Telephone: (435) 252-1360

STERLING A. BRENNAN
L. REX SEARS
**MASCHOFF BRENNAN**
111 S Main Street, Ste. 600
Salt Lake City, Ut 84111
Telephone: (801) 297-1850

*Attorneys for Appellant*

SEPTEMBER 19, 2023

# U.S. Patent No. 7,956,739

## Claim 1

1.    A method for providing distributed access services between a watcher and at least one personal presentity, the method comprising:

> receiving, at a computing device, an alert from a personal presentity;
>
> determining a current location of the watcher;
>
> providing a notification associated with the alert to the watcher; and
>
> storing data related to a current location of the watcher.

# CERTIFICATE OF INTEREST

1.      Represented Entities. Fed. Cir. R. 47.4(a)(1).

The full names of all entities represented by undersigned counsel in this case:

Vivint, Inc.

2.      Real Party in Interest. Fed. Cir. R. 47.4(a)(2).

The full names of all real parties in interest for the represented entities, other than the named party entities:

None

3.      Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3).

The full names of all parent corporations for the represented entities and all publicly held companies that own 10% or more stock in the represented entities:

NRG Energy, Inc.

Date: September 19, 2023         _/s/ L Rex Sears_
                                                      L. Rex Sears

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

STATEMENT OF RELATED CASES ....................................................1

JURISDICTIONAL STATEMENT .........................................................2

STATEMENT OF ISSUES PRESENTED................................................2

STATEMENT OF THE CASE..................................................................2

    A.    Procedural history...............................................................2

    B.    The '739 patent claims. ......................................................3

    C.    The parties' contentions and the Board's analysis.................4

SUMMARY OF ARGUMENT ..................................................................6

STANDARD OF REVIEW .......................................................................7

ARGUMENT ...........................................................................................7

I.    The specification teaches that "determining a location" requires using a location service to determine location. .................7

II.    The Board's analysis is faulty. ........................................................ 14

    A.    The Board confused interpretation with importing limitations. .......................................................................... 14

    B.    The Board's juxtaposition of Vivint's construction with a supposed "plain and ordinary meaning" is inaccurate and untenable................................................................................ 15

    C.    The Board misread the specification's use of "optional." ..... 17

    D.    Additional considerations favor Vivint's construction. ........ 22

CONCLUSION .......................................................................................25

CERTIFICATE OF SERVICE ...............................................................27

CERTIFICATE OF COMPLIANCE.......................................................28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aristocrat Technologies Australia Pty Limited. v.*
*International Game Technology,*
521 F.3d 1328 (Fed. Cir. 2008) ........................................... 25

*Athletic Alternatives, Inc. v. Prince Manufacturing, Inc.,*
73 F.3d 1573 (Fed. Cir. 1996) ............................................. 24

*EI du Pont de Nemours & Co. v. Phillips Petroleum Co.,*
849 F.2d 1430 (Fed. Cir. 1988) ........................................... 15

*Hamilton Beach Brands, Inc. v. f'real Foods, LLC,*
908 F.3d 1328 (Fed. Cir. 2018) ............................................. 7

*Innova/Pure Water, Inc. v. Safari Water Filtration System,*
*Inc.,*
381 F.3d 1111 (Fed. Cir. 2004) ........................................... 13

*Kaken Pharm. Co. v. Iancu,*
952 F.3d 1346 (Fed. Cir. 2020) ........................................... 26

*Markman v. Westview Instruments, Inc.,*
52 F.3d 967 (Fed. Cir. 1995) .............................................. 14

*Phillips v. AWH Corp.,*
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ..................... 14, 23

*Vitronics Corp. v. Conceptronic, Inc.,*
90 F.3d 1576 (Fed. Cir. 1996) ........................................... 14

## Rules

Fed. Cir. R. 32 ................................................................. 28

## Statutes

28 U.S.C. § 1295 ............................................................... 2

iv

35 U.S.C. § 141 ........................................................................... 2

35 U.S.C. § 318 ........................................................................... 2

## INTRODUCTION

Appellant Vivint, Inc.'s U.S. Patent No. 7,956,739 has 17 claims, three of them independent. On *inter partes* review, the Patent Trial and Appeal Board ruled that all 17 claims are obvious in view of U.S. Patent No. 7,683,924 to Oh, either alone or in combination with two other references. This Court should vacate and remand because the Board's rulings rest on a faulty construction of "determining a current location of the watcher," in claim 1, and corresponding limitations in the other independent claims.

## STATEMENT OF RELATED CASES

Vivint is unaware of any prior appeal in or from the Board proceeding from which this appeal arises.

*Vivint, Inc. v. ADT LLC*, No. 2:21-cv-00115 in the United States District Court for the District of Utah, and *SB IP Holdings, LLC v. Vivint Smart Home, Inc.*, No. 4:20-cv-00886 in the United States District Court for the Eastern District of Texas, will be directly affected by this court's decision in the pending case.

## JURISDICTIONAL STATEMENT

Vivint appeals the February 10, 2023 Judgment Determining All Challenged Claims Unpatentable ("Judgment") entered by the Patent Trial and Appeal Board ("Board") of the United States Patent and Trademark Office ("Office) under 35 U.S.C. § 318(a) as Paper 33 in *ADT LLC, et al. v. Vivint, Inc.*, IPR2021-01374. Appeal from the Judgment lies, in this Court, under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## STATEMENT OF ISSUES PRESENTED

Did the Board err by finding the claims of Vivint's '739 patent unpatentable over Oh and other references, where, in order to read the claims on Oh and combinations that include Oh, the Board construed "determin[ing/e] a current location of [the watcher/a user]" in a way that is not faithful to the specification?

## STATEMENT OF THE CASE

### A.    Procedural history.

Vivint sued ADT LLC for infringing the '739 and four other patents. ADT petitioned the Board for *inter partes* review of all the asserted patents. Two of ADT's petitions, including the '739 petition,

were joined by Alarm.com, Inc., which provides ADT's infringing "backend" service.

The Board instituted proceedings on the '739 and one of the other patents; the Board denied institution as to the other three. In this appeal, Vivint seeks relief from the Board's adverse Judgment on the '739 patent.

**B.    The '739 patent claims.**

The '739 patent has 17 claims; claims 1, 8, and 12 are independent. Claim 1 is:

> A method for providing distributed access services between a watcher and at least one personal presentity, the method comprising:
>
>> receiving, at a computing device, an alert from a personal presentity;
>>
>> determining a current location of the watcher;
>>
>> providing a notification associated with the alert to the watcher; and
>>
>> storing data related to a current location of the watcher.

APPX00154. Claim 8 is directed to "[a] computer-readable storage medium storing computer executable instructions" for performing a similar method; claim 12 is directed to a system with "an interface device" and "a presentity application" that are configured to perform a

3

similar method. APPX00154. In place of claim 1's location-determining step: claim 8 recites that its software instructions are "configured to perform" "determining a current location of a user"; claim 12 recites that its presentity application is "configured [to] cause the system to: determine a current location of the watcher." APPX00155.

## C. The parties' contentions and the Board's analysis.

The Board held claims 1-3 and 6-11 obvious in view of Oh, and the remaining claims (4, 5, and 12-17) obvious in view of Oh combined with two other references. Both the standalone and the combination analyses are premised on Oh teaching the "determin[ing/e] a current location of [the watcher/a user]" limitation of each independent claim.

The Board construed "'determining a current location of the user' to include determining a *physical* location of a computing device associated with the user." APPX00016. The '739 patent's specification describes that computing device as a "device with watcher client application **104** … exemplified … as … handheld computing device **204**, such as a smartphone, a PDA, and the like." 5:3-6.

Vivint does not dispute the incorporation of a device associated with the user into the construction of "determin[ing/e] a current location

4

of [the watcher/a user]." But under Vivint's construction, this limitation more specifically requires *using a location service* to determine location. As of the '739 patent's priority date, "location services … were well-known in the art." APPX02920 [Ppr 22 at 7 n. 5]. More specifically, "[a] POSITA in September 2006 … would have understood the term 'location service' as referring to technology that delivers *geographic* location information associated with certain user equipment or mobile equipment." APPX01985 (italics added) [Ppr 19 at 15]. Based on that construction, Vivint argued that Oh does not teach the location determination limitation because Oh does not teach the use of a location service.

ADT made contrary arguments on both points. That is, ADT argued below both that Oh teaches determining location using a location service *and* that "determin[ing/e] a current location of [the watcher/a user]" does not require the use of a location service. The Board concluded that Oh teaches "determin[ing/e] a current location of [the watcher/a user]" because the Board agreed with ADT on claim construction. APPX00022. But the Board did not adopt ADT's alternate conclusion that Oh teaches a location service.

5

## SUMMARY OF ARGUMENT

In the context of the '739 patent, "determin[ing/e] a current location of [the watcher/a user]" means *using a location service* to determine the location of a device associated with the user. The Board's contrary ruling runs counter to the intrinsic evidence. This Court should correct that claim construction error.

Correction of that error undoes the Board's obviousness analyses. But unfortunately, the Board's analysis is not complete enough for this Court to reverse outright. Specifically, the Board left unresolved the parties' dispute over whether Oh teaches the use of a location service; and thus the Board made no finding for this Court to review as to whether, under a *proper* construction, Oh teaches determining a user's current location. Therefore, although Vivint would prefer outright reversal, candor compels it to admit that this Court should go no further, on the incomplete record before it, than to vacate and remand, for the Board to make that determination in the first instance.

## STANDARD OF REVIEW

"Claim construction based solely upon intrinsic evidence, as is the case here, is a matter of law reviewed de novo." *Hamilton Beach Brands, Inc. v. f'real Foods, LLC*, 908 F.3d 1328, 1339 (Fed. Cir. 2018).

## ARGUMENT

**I. The specification teaches that "determining a location" requires using a location service to determine location.**

The Abstract of the '739 patent describes the subject matter as follows:

> A monitoring and entry system presence service provides notification about a trigger event to a user and performs actions based on user input. … Upon determining the location of a user, notification and a list of actions are provided through a watcher client application. In response to the user selection, actions are facilitated through the same network session(s).

Figure 9 illustrates an embodiment involving a doorbell:



900

Start

902 — Receive Doorbell Indication Signal Through Established Session

904 — Determine Current Location of Resident

906 — Location Determined?

No

908 — Facilitate Default Action

End

YES

910 — Update Aggregate Presence Service

912 — Notify Resident

914 — Receive Resident Selection For Action

916 — Facilitate Selected Action

End

*METHODS*

## FIG. 9

"At operation **904**, the doorbell application **232** determines a current location of the resident *using a location service*." APPX00154 at 9:26-27 [739].

That the location of the resident (or watcher or user) is determined *using a location service* is a constant that runs throughout the written description. First, in connection with Figure 1, the specification explains: "Application layer **130** may include … an application for providing the presence service, and even an application for providing a location service to determine a location of a user to be notified." APPX00151 at 3:47-52 [739].

Then in connection with Figure 2, reproduced below left, it explains: "Doorbell application **232** is configured to receive notification from doorbell **202**, communicate with presence server **234** and optional location service **236** to determine a location and reach the user"; and "Optional location service **236** is arranged to determine a location of the user and provide it to doorbell application **232**." 5:33-36, 45-47.

9



FIG. 2                                    FIG. 4

Next the specification explains that Figure 4, reproduced above right,

"illustrates the example doorbell presence service of FIG. 2 integrated

with IMS architecture"—this integration is illustrated by the additional

structure that Figure 4 introduces for the Control / Session Layer **120**—

before going on to say: "Doorbell application **232** determines a location

of the user (resident) and notifies presence service **234**." 6:50-52, 64-66.

The Board identified this as an "instance[]" of "the specification …

mention[ing] determining a location *without* referring to a location

service." APPX00018-APPX00019. But this passage is in a paragraph

10

that begins: "FIG.4 illustrates the example doorbell presence service of

FIG.2 integrated with IMS architecture according to embodiments"; and

in connection with Figure 2, the specification already explained:

"Doorbell application **232** is configured to … communicate with …

optional location service **236** to determine a location," and "Optional

location service **236** is arranged to determine a location of the user and

provide it to doorbell application **232**." 5:33-36, 45-47.

Figure 5, reproduced below, consists of "Diagram **500**," which

"summarizes the interactions described in FIG. 2 and FIG. 4." 7:16-18.



EXAMPLE DOORBELL
PRESENCE SERVICE

## FIG. 5

"According to diagram **500**, doorbell presence hardware **502** initiates a

session by providing a notification to doorbell presence application **532**";

then, "Doorbell presence application **532** may optionally determine a

location of the resident using location service **236**." 7:18-22. Then in

connection with Figure 6, the written description refers back to what it

said about Figure 5: "Although not shown, doorbell presence application

12

**532** may determine a location of the resident using a location service." 7:52-53.

Finally, Figure 9 "illustrates a logic flow diagram for a process of providing doorbell presence service," which "may be implemented in doorbell presence application **232**." 9:17-20. In that process, as noted above: "At operation **904**, the doorbell application **232** determines a current location of the resident using a location service." 9:26-27.

The foregoing is an exhaustive review of written disclosure and figure references to determining location. Other than the Abstract, every reference to determining location is to determining location *using a location service*. And "the Abstract of the patent" does not "weigh heavily" in claim construction, because it only "speaks generally to the invention and, much like the syllabus of an opinion, sets forth general information about the document's content, which is described in more detail in the remainder of the document." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1121 (Fed. Cir. 2004).

"[T]he words of a claim 'are generally given their ordinary and customary meaning,'" which is "the meaning that the term would have to a person of ordinary skill in the art … as of the effective filing date of

13

the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313; *see also Vitronics*, 90 F.3d at 1582 ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."). So read—i.e., "read in view of the specification, of which [the claims] are a part," *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)—"determin[ing/e] a current location of [the watcher/a user]" means *using a location service* to determine the location of a device associated with the user.

## II. The Board's analysis is faulty.

### A.    The Board confused interpretation with importing limitations.

The Board characterized Vivint's claim-construction arguments as "ask[ing] that we import" "the requirement of a location service into a plainly understood claim term." APPX00017, APPX00019. But "us[ing]

14

the specification to interpret what the patentee meant by a word or
phrase in the claim" "is not to be confused with adding an extraneous
limitation appearing in the specification." *EI du Pont de Nemours & Co.
v. Phillips Petro. Co.*, 849 F.2d 1430 (Fed. Cir. 1988). Here, Vivint is
engaged in the former, not the latter.

### B.    The Board's juxtaposition of Vivint's construction with a supposed "plain and ordinary meaning" is inaccurate and untenable.

The Board justified its rejection of Vivint's claim construction
analysis as an exercise in claim importation by characterizing location
determination as "a plainly understood claim term." APPX00019. More
specifically, according to the Board, "the plain and ordinary meaning of
'determining a current location of the user' … include[s] determining a
*physical* location of a computing device associated with the user." 16; *see
also* 22 ("based on the specification of the '739 patent, including the
plain language of the challenged claims, we construe the claim term
'[determining or determine] a current location' as including determining
a physical location of a computing device associated with the user").
Starting from the premise that "determining a current location" is plain
language with a plain and ordinary meaning that includes determining

a physical location of a computing device associated with the user, the Board concludes that by advocating something *beyond* that baseline, Vivint must be engaged in importing limitations from the specification.

But the Board erects a false dichotomy, as is evident from the Board's own construction. The Board did not construe "determining a current location of the user" as simply determining a location, or even determining a *physical* location, of a user; instead, the Board construed it as determining a physical location of *a computing device associated with* the user. The connection between location determination, as recited in the claims, and a computing device associated with the user, as recited in the Board's construction, could only come from the specification.

Indeed further reflection on the Board's construction confirms that it implicitly draws even more content from the specification than is apparent on its face. According to the Board, "a person of ordinary skill in the art would have understood the claims to encompass any … known method[]" for determining the location of a user's mobile device, APPX00020. But that cannot be right. If the claim limitation really required nothing more than determining the physical location of a

device associated with the user, by any known method, then the

limitation could be met by, for example, hiring Sam Spade or some

other gumshoe detective to track down the user and verify that she has

her phone. Clearly, however, that would be outside the scope of the

claims.

"[T]he plain language of the challenged claims" is insufficient to

fix the proper scope of "determining a current location of the user." *Cf.*

APPX00022. Instead, recourse must be had to the written description

and figures—which tie location determination to a location service as

surely as they tie it to a computing device associated with the user.

### C.   The Board misread the specification's use of "optional."

The Board also tries to justify its rejection of Vivint's construction

by reasoning that "[t]he specification … makes it abundantly clear that

the use of a 'location service' is 'optional.'" APPX00017. The Board gives

three examples:

> Figure 2 … depicts the location service 236 using a
> dashed line, thus indicating that it is an optional
> component of the doorbell presence service architecture.
>
> Referring to the location service 236, the specification
> states:
>> Doorbell application 232 is configured to receive
>> notification from doorbell 202, communicate with

> presence server 234 and *optional location service 236* to determine a location and reach the user through computing device 204, and perform tasks for execution of action(s) selected by the user.
>
> The specification further states that "[subscriber location function] 342 may be an interface function for the *optional location service 236* of architecture 200."

APPX00017. All three examples tie back to the location service 236 of architecture 200, as shown in Figure 2:



*EXAMPLE DOORBELL PRESENCE*
*SERVICE ARCHITECTURE*

## FIG. 2

"FIG. 2 illustrates an example doorbell presence service *architecture*."

2:10-11 (italics added). "FIG. 9," on the other hand, "illustrates a logic

flow diagram for a *process*," 2:27 (italics added):

19



900

**Start**

902 — Receive Doorbell Indication Signal Through Established Session

904 — Determine Current Location of Resident

906 — Location Determined?

No — 908 — Facilitate Default Action — **End**

YES

910 — Update Aggregate Presence Service

912 — Notify Resident

914 — Receive Resident Selection For Action

916 — Facilitate Selected Action

**End**

*METHODS*

## FIG. 9

Instructively, the specification does *not* describe the *use* of a location service as optional, in connection with Figure 9; instead, it says: "[a]t operation **904**, the doorbell application **232** determines a current location of the resident using a location service." 9:26-27.

The specification's use of "optional" in connection with the architecture but not the process avoids a divided infringement problem, by making clear that the location service used by the patented process does not need to be provided by the infringer. With reference to Figure 2: the location service 236 might or might not be part of the infringer's application layer 200; all that matters is that the doorbell application 232 in that layer invoke a location service 236—whether or not that service itself is part of the same layer.

Claim 1, for example, is directed to "[a] method … comprising: receiving, *at a computing device*, an alert from a personal presentity; [and] determining a current location of the watcher." APPX00154, 10:15-20 (italics added). The computing device at which the alert is received has to be, in some sense, the direct infringer's. By describing the location service as optional, in connection with the architecture, the applicant cuts off an argument that the location service used to perform

the location determination step also has to be associated with the direct infringer—and leaves open the possibility of direct infringement by using someone else's location service (so long as it is the direct infringer—or the direct infringer's computing device—who invokes that service).

That the specification does *not* use "optional" in connection with the *process*, even though it repeatedly refers to the *architectural component* as "optional," fortifies Vivint's position that the *step* of "determining the location of a user" requires the use of a location service.

### D.    Additional considerations favor Vivint's construction.

As shown above, although the Board tried to frame its decision as adhering to "the plain and ordinary meaning of 'determining a current location of the user,'" APPX00016, while rejecting Vivint's effort to "import the requirement of a location service into a plainly understood claim term," APPX00019, that is not what the Board actually did. Instead, the Board drew from the specification in order to explicitly tie determining the user's location to determining the location of "a computing device associated with the user." Nor did the Board truly

leave the scope of the term so open as "to encompass *any* … known methods of determining … location," *cf.* APPX00020 (italics added); rather, the Board's construction must, at least implicitly, exclude manual location determination methods.

Thus the real question presented is not and never was whether to adhere to or depart from "the plain and ordinary meaning" of "a plainly understood claim term." *See* APPX00016, APPX00019. Instead it is the question that *Phillips* required to be addressed, all along: whether, in light of the specification, "determining a current location of the user" should be understood not only (1) to exclude manual location methods, and (2) to be tied to "a computing device associated with the user," but also (3) to require the use of a location service.

As shown above, the best reading of the claim term, in light of the specification, ties location determination to a location service, just as it ties that limitation to a computing device associated with the user. Vivint's construction, which further restricts location determination to the use of a location service, is also supported by the principle that "[w]here there is an equal choice between a broader and a narrower meaning of a claim, … the notice function of the claim [is] best served

by adopting the narrower meaning." *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1581 (Fed. Cir. 1996).

Although the Board nominally eschewed "resort to the extrinsic evidence," it credited ADT's expert's testimony that "various methods of determining the location of a mobile device were known at the time of the patent," and it construed the location-determination limitation "to encompass any of those known methods of determining the location." APPX00017, APPX00020. But the Board cannot have meant to include manual methods. Making that exclusion explicit, the Board's construction amounts to: using a computer to "determin[e] a *physical* location of a computing device associated with the user." *Cf.* APPX00016. That is, even under the Board's construction, the claim language is limited to a certain class of instrumentalities for performing the step of determining a user's location. Vivint's construction replaces the generic invocation of a computer with the more specific requirement of a location service. Whether or not various other computerized methods were known, only one is identified in the specification. It makes sense to construe the claim language accordingly, as requiring

24

the use of a location service rather than the use of a computer more generically.

While not controlling, *Aristocrat Technologies Australia Pty Ltd. v. International Game Technology*, 521 F.3d 1328 (Fed. Cir. 2008), is instructive. As *Aristocrat* explained:

> In cases involving a computer-implemented invention in which the inventor has invoked means-plus-function claiming, this court has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor. The point of the requirement that the patentee disclose particular structure in the specification and that the scope of the patent claims be limited to that structure and its equivalents is to avoid pure functional claiming.

*Id.* at 1333. Construing "determining a current location of the user" to require not just a general purpose computer but more specifically a location service moves the '739 patent further away from purely functional claims.

## CONCLUSION

The Board erred by construing "determin[ing/e] a current location of [the watcher/a user]" as *not* requiring the use of a location service. The Board's further ruling that Oh invalidates, either alone or in combination with other references, depends on that faulty construction.

"[T]he appropriate course in this case, as in so many others involving a reversal of a Board claim construction, is to vacate the Board's decision and remand the matter," for the Board to make an initial determination "whether the correct claim construction permits the same factual findings"—notably, whether the claim language *properly construed* reads on Oh—"or obviousness conclusion." *See Kaken Pharm. Co. v. Iancu*, 952 F.3d 1346, 1355 (Fed. Cir. 2020).

Respectfully submitted this 19th day of September, 2023.

by:  */s/ L. Rex Sears*
R. PARRISH FREEMAN
ERIC L. MASCHOFF
**MASCHOFF BRENNAN**
1389 Center Drive, Ste. 300
Park City, Utah 84098
Telephone: (435) 252-1360

STERLING A. BRENNAN
L. REX SEARS
**MASCHOFF BRENNAN**
111 S Main Street, Ste. 600
Salt Lake City, Ut 84111
Telephone: (801) 297-1850

*Attorneys for Appellant*

# CERTIFICATE OF SERVICE

I hereby certify that on September 19, 2023 an electronic copy of the foregoing **CORRECTED APPELLANT VIVINT, INC.'S OPENING BRIEF** was filed electronically with the U.S. Court of Appeals for the Federal Circuit by means of the Court's CM/ECF system and thereby causing a "Notice of Electronic Filing" to be served on all counsel of record.

Date: September 19, 2023                    */s/ L. Rex Sears*
                                                     L. Rex Sears

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b), this document contains 3,713 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

Date: September 19, 2023      _____*/s/ L Rex Sears*_____
L. Rex Sears

# ADDENDUM

Trials@uspto.gov                                                    Paper 33
571-272-7822                                          Entered: February 10, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

ADT LLC and ALARM.COM, INC.,[1]
Petitioner,

v.

VIVINT, INC.,
Patent Owner.

———————

IPR2021-01374
Patent 7,956,739 B2

———————

Before MICHAEL R. ZECHER, CHARLES J. BOUDREAU, and
IFTIKHAR AHMED, *Administrative Patent Judges*.

AHMED, *Administrative Patent Judge*.

JUDGMENT
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

———————

[1] Alarm.com, Inc., which filed a petition in IPR2022-00714, is joined as
petitioner in this proceeding.

IPR2021-01374
Patent 7,956,739 B2

## I.  INTRODUCTION

ADT LLC ("ADT") requested an *inter partes* review of claims 1–17 (the "challenged claims") of U.S. Patent No. 7,956,739 B2 (Ex. 1001, "the '739 patent").  Paper 1 ("Petition" or "Pet.").  Vivint, Inc. ("Patent Owner") did not file a preliminary response.  Applying the standard set forth in 35 U.S.C. § 314(a), we instituted an *inter partes* review as to all of the challenged claims and on all the grounds raised in the Petition.  Paper 6 ("Inst. Dec.").

After institution, Alarm.com Inc. ("Alarm") filed a petition in IPR2022-00714 (challenging the same claims of the '739 patent on the same grounds) and a motion for joinder (seeking to join this proceeding as a petitioner).  *Alarm.com Inc. v. Vivint, Inc.*, IPR2022-00714 (PTAB Mar. 15, 2022), Papers 1 (petition), 3 (motion for joinder).  We granted institution in IPR2022-00714 and granted Alarm's motion for joinder.  *Id.* at Paper 9 (PTAB July 8, 2022); IPR2021-01374, Paper 20.  Accordingly, we refer to ADT and Alarm, collectively, as "Petitioner."

Also following institution, Patent Owner filed a Patent Owner Response (Paper 19, "PO Resp."), Petitioner filed a Reply to Patent Owner's Response (Paper 22, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 24, "PO Sur-reply").  An oral hearing was held on November 15, 2022, and a copy of the transcript was entered in the record.  Paper 32 ("Tr.").

We have jurisdiction pursuant to 35 U.S.C. § 6.  This Decision is a Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of the claims on which we instituted trial.  To prevail, Petitioner must prove unpatentability by a preponderance of the evidence.

IPR2021-01374
Patent 7,956,739 B2

*See* 35 U.S.C. § 316(e) (2018); 37 C.F.R. § 42.1(d) (2020). Having reviewed the arguments and the supporting evidence, we determine that Petitioner has shown, by a preponderance of the evidence, that claims 1–17 of the '739 patent are unpatentable.

## II.  BACKGROUND

### A.  *Real Parties in Interest*

Petitioner identifies ADT LLC, ADT Inc., Alarm.com Incorporated, and Alarm.com Holdings, Inc. as the real parties in interest. Pet. 1; IPR2022-00714, Paper 1, 1. Patent Owner identifies itself as the real party in interest, noting that "Vivint, Inc. is a wholly owned subsidiary of Vivint Smart Home, Inc." Paper 4, 2.

### B.  *Related Proceedings*

According to the parties, the '739 patent is asserted in *Vivint, Inc. v. ADT LLC*, No. 2:21-cv-00115 (D. Utah), filed February 25, 2021; and in *SB IP Holdings, LLC v. Vivint Smart Home, Inc.*, No. 4:20-cv-00886 (E.D. Tex.), counterclaim filed May 14, 2021. Pet. 1; Paper 4, 2.

### C.  *The '739 Patent (Ex. 1001)*

The '739 patent, titled "Monitoring and Entry System Presence Service," was filed on June 12, 2009, and is a continuation of U.S. Patent Application No. 11/520,262 (now U.S. Patent No. 7,561,041 B2) filed on September 13, 2006. Ex. 1001, codes (22), (54), (63). The '739 patent is related to methods and systems for "facilitating integration of monitoring and entry systems with a presence service." *Id.* at 1:15–18. More specifically, the '739 patent describes methods and systems for providing a notification and interaction system integrated with a unified presence

IPR2021-01374
Patent 7,956,739 B2

application interface. *Id.* at 1:47–52. The system provides a notification to a user in response to a trigger event at an interface device, such as a doorbell or an alarm monitor, and also provides the user with a selection of actions, such as video of the location, two-way communications, and enabling entry to a premise. *Id.* at 1:53–62, 3:16–19.

Figure 2 of the '739 patent is reproduced below.



FIG. 2

Figure 2 illustrates an example doorbell presence service architecture. Ex. 1001, 2:10–12. The doorbell presence service architecture includes doorbell 202, handheld computing device 204, such as a smartphone or personal digital assistant ("PDA"), optional location service 236, which

4

IPR2021-01374
Patent 7,956,739 B2

determines the user's location, and doorbell application 232, which is
configured to receive notification from the doorbell, communicate with
presence server 234, and execute actions selected by the user. *Id.* at
4:63–5:63.

Figure 5 of the '739 patent is reproduced below.



EXAMPLE DOORBELL
PRESENCE SERVICE

**FIG. 5**

Figure 5 illustrates a conceptual diagram of the components of a doorbell
presence service. Ex. 1001, 2:18–20. A doorbell presence service is a
network-based service which receives messages from a residence whenever
the doorbell is pressed, i.e., when doorbell presence hardware 502 initiates a
session by providing a notification to doorbell presence application 532 that
someone is at the door. *Id.* at 7:14–20. The application may optionally
determine the resident's location using location service 236 and provide it to

IPR2021-01374
Patent 7,956,739 B2

aggregate presence service 534, which updates presentity store 528 and
enables watcher client application 504 to provide a notification to the user.
*Id.* at 7:20–26.  Watcher client application 504 also allows the user to select
from a list of actions to be executed.  *Id.* at 7:26–28.

Figure 9 of the '739 patent is reproduced below.



*FIG. 9*

Figure 9 illustrates a logic flow diagram for the process of providing
doorbell presence service, from receiving a doorbell indication to facilitating
a resident's selected action.  Ex. 1001, 2:17–20, 9:16–65.

IPR2021-01374
Patent 7,956,739 B2

*D. Challenged Claims*

Petitioner challenges claims 1–17, of which claims 1, 8, and 12 are independent claims. Claim 1 is reproduced below.

> 1.    A method for providing distributed access services between a watcher and at least one personal presentity, the method comprising:
>
> receiving, at a computing device, an alert from a personal presentity;
>
> determining a current location of the watcher;
>
> providing a notification associated with the alert to the watcher; and
>
> storing data related to a current location of the watcher.

Ex. 1001, 10:15–23. Claim 12 is reproduced below.

> 12.    A system for providing distributed access services between a watcher and a personal presentity, comprising:
>
> an interface device configured to:
>
> detect a trigger event; and
>
> provide a notification associated with the trigger event, wherein the interface device acts as the personal presentity; and
>
> a presentity application configured cause the system to:
>
> determine a current location of the watcher;
>
> provide the current location of the watcher to an aggregate presence service; and
>
> in response to receiving a watcher selection from the aggregate presence service, facilitate execution of the selected action by activating at least one of a plurality of client applications associated with the personal presentity.

Ex. 1001, 11:6–20.

IPR2021-01374
Patent 7,956,739 B2

### E. *The Prior Art and Instituted Grounds of Unpatentability*

We instituted trial based on the following grounds of unpatentability:

| Claims Challenged | 35 U.S.C. §[2] | Reference(s)/Basis |
|---|---|---|
| 1–3, 6–11 | 102(e) | Oh[3] |
| 1–3, 6–11 | 103(a) | Oh |
| 4, 5, 12–17 | 103(a) | Oh, Forbes,[4] TS23.141[5] |

Pet. 3. Petitioner supports its arguments with declaration testimony of
Mr. Peter Rysavy. Exs. 1017, 1032; Pet. 3, 10–57. Patent Owner supports
its arguments with declaration testimony of Dr. Matthew B. Shoemake.
Ex. 2001.

### III. ANALYSIS

### A. *Principles of Law*

"In an [*inter partes* review], the petitioner has the burden from the
onset to show with particularity why the patent it challenges is
unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed.
Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review
petitions to identify "with particularity . . . the evidence that supports the

---

[2] Because the '739 patent issued from a patent application that was filed
before March 16, 2013, patentability is governed by the versions of
35 U.S.C. § 102 and § 103 preceding the Leahy-Smith America Invents Act
("AIA"), Pub L. No. 112–29, 125 Stat. 284 (2011).
[3] U.S. Patent No. 7,683,924 B2, issued March 23, 2010 (Ex. 1004, "Oh").
[4] U.S. Patent No. 7,596,102 B2, issued Sept. 29, 2009 (Ex. 1005, "Forbes").
[5] 3GPP TS 23.141 v6.8.0, *3rd Generation Partnership Project ("3GPP");
Technical Specification Group Services and System Aspects; Presence
Service; Architecture and functional description (Release 6)* (2005)
(Ex. 1006, "TS23.141").

8

IPR2021-01374
Patent 7,956,739 B2

grounds for the challenge to each claim")); *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (discussing the burden of proof in *inter partes* review).

"Anticipation requires that every limitation of the claim in issue be disclosed, either expressly or under principles of inherency, in a single prior art reference," *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1255–56 (Fed. Cir. 1989), and that the claim limitations be "arranged or combined in the same way as recited in the claim[]," *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008).

As set forth in 35 U.S.C. § 103(a),

> [a] patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective evidence of obviousness or nonobviousness.[6] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). An obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). However, Petitioner cannot satisfy its burden of

---

[6] Neither party presents evidence of objective considerations of obviousness or non-obviousness.

IPR2021-01374
Patent 7,956,739 B2

proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016). Instead, Petitioner must articulate a reason why a person of ordinary skill in the art would have combined the prior art references. *In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016).

We analyze the asserted grounds of unpatentability in accordance with these principles to determine whether Petitioner has met its burden to establish unpatentability of the challenged claims by a preponderance of the evidence.

### B.  Level of Ordinary Skill in the Art

We review Petitioner's asserted obviousness grounds in view of the understanding of a person of ordinary skill in the art at the time of the invention. *Graham*, 383 U.S. at 17. Petitioner contends that a person of ordinary skill in the art would have had a bachelor's degree in computer science, electrical engineering, or computer engineering (or equivalent experience) and two years of experience in monitoring or telecommunications systems. Pet. 6 (citing Ex. 1017 ¶ 25). Patent Owner does not dispute Petitioner's definition for a person of ordinary skill in the art. *See generally* PO Resp.

We determine, on the complete record, that the level of ordinary skill proposed by Petitioner is consistent with the '739 patent and the asserted prior art. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). We adopt that level in deciding unpatentability of the challenged claims.

IPR2021-01374
Patent 7,956,739 B2

## C.  Claim Construction

In this *inter partes* review, claims are construed using the same claim construction standard that would be used to construe the claims in a civil action under 35 U.S.C. § 282(b).  *See* 37 C.F.R. § 42.100(b) (2021).  That claim construction standard includes construing claims in accordance with the ordinary and customary meaning of such claims as would have been understood by one of ordinary skill in the art at the time of the invention. *See id.*; *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–14 (Fed. Cir. 2005).  In construing claims in accordance with their ordinary and customary meaning, we take into account the specification and prosecution history.  *Phillips*, 415 F.3d at 1315–17.

Patent Owner proposes constructions for the terms "[determining or determine] a current location" and "aggregate presence service," which are disputed by Petitioner.  *See* PO Resp. 4–23; Pet. Reply 1–9, 20–21. Accordingly, we address the parties' arguments below.

### 1.  *[Determining or determine] a current location*

#### a)  *The Parties' Arguments*

Patent Owner argues that the term "determine a current location" or "determining a current location" of a "watcher" or "user" should be construed as "obtaining location information from a location service regarding a computing device associated with the watcher/user."  PO Resp. 19 (citing Ex. 2001 ¶ 99).  Patent Owner contends that "[t]he '739 patent describes the application layer of its monitoring and entry system architecture as including 'an application for providing the presence service, and even an application for providing <u>a location service to determine a location of a user</u> to be notified.'"  *Id.* at 8 (citing Ex. 1001, 3:49–52, Fig. 1).

IPR2021-01374
Patent 7,956,739 B2

Patent Owner further contends that, if a location service is engaged, "the presence application in the application layer (*e.g.*, a doorbell presence application) accesses information from the location service regarding the watcher/user's mobile device and reports it to the presence server." *Id.* at 8 (citing Ex. 1001, code (57), 5:32–37, 6:64–67, 7:18–26, 7:30–31, 9:19–22, Figs. 2, 4, 5; Ex. 2001 ¶ 84). According to Patent Owner, "[t]he '739 patent does not address 'determining a location' without tying it expressly or impliedly to use of a 'location service.'" *Id.* at 9–11 (citing Ex. 1001, 3:50–52, 5:34–36, 5:45–47, 6:64–66, 7:20–22, 7:52–53, Figs. 2, 4, 5, 6, 9; Ex. 2001 ¶¶ 84–85). Patent Owner asserts that "[t]here is no other means of 'determining' a location discussed or suggested by the '739 patent that <u>does not</u> involve use of a location service," and thus, "'determining a current location' in the context of the claims of the '739 patent can only mean doing so by using a location service." *Id.* at 11 (citing Ex. 2001 ¶ 85).

Next, Patent Owner points to extrinsic evidence, including certain "IETF and 3GPP (and other) standards documents" to argue that a person of ordinary skill in the art "would have understood the term 'location service' as referring to technology that delivers geographic location information associated with certain user equipment or mobile equipment." *Id.* at 12–15 (citing Ex. 2003 §§ 3.1–3.3, 5, 6.3.4; Ex. 2004 §§ 1, 4.2.1; Ex. 2008, 1; Ex. 2009, xvii; Ex. 2001 ¶¶ 86–91). Patent Owner also argues that location information sourced from a location service is different from an Internet Protocol ("IP") address or other network address information. *Id.* at 16–19 (citing Ex. 1001, 6:33–40, 7:50–61; Ex. 2003 § 9.1.1; Ex. 2001 ¶¶ 93–99).

Petitioner responds that Patent Owner's proposal "adds limitations regarding a 'location service' and 'geographic location information' that are

unsupported by the claims and specification," and that the plain meaning of the term "at least encompasses determining a physical location of a computing device associated with the user such that communications can be established between the user and a visitor." Pet. Reply 1 (citing Ex. 1032 ¶ 11). Petitioner argues that the claims do not require that "location" be determined in any particular way, or that a specific type of location-related information needs to be obtained, or even require that the location be used for anything beyond establishing communications between the user and visitor. *Id.* at 2–3 (citing Ex. 1032 ¶¶ 19–20). Petitioner contends that the disclosed system "determine[s] a location of the user . . . such that communication with the user can be established," and that the '739 patent specification does not identify any other purpose for determining the location of the user. *Id.* at 3 (quoting Ex. 1001, 5:45–48) (citing Ex. 1001, 1:14–43; Ex. 1032 ¶ 21). Petitioner argues that a person of ordinary skill in the art would have understood that "the physical location of the user's computing device is at least determined in a manner that enables communication between the user and visitor," e.g., whether the user is at home or in a remote location. *Id.* at 4 (citing Ex. 1001, 7:9–12; Ex. 1017 ¶¶ 98, 105; Ex. 1032 ¶¶ 9–29).

Petitioner further contends that "the specification expressly—and repeatedly—states that the use of a 'location service' is 'optional,'" and that "there is no 'clear statement,' 'manifest exclusion' or 'clear disavowal' limiting the claims to an embodiment involving a location service." Pet. Reply 5 (citing Ex. 1001, 5:30–36, 5:45, 6:40; Ex. 2001 ¶ 83). Instead, Petitioner points out the specification specifically states that the "detailed description is . . . ***not to be taken in a limiting sense***, and the scope of the

IPR2021-01374
Patent 7,956,739 B2

present invention *is defined by the appended claims*." *Id.* (citing Ex. 1001,
2:41–44, 10:4–13). Petitioner asserts that, contrary to Patent Owner's
construction, the specification expressly discloses an embodiment in which
doorbell application 232 that determines a location of the user is shown
separate from optional location service 236, and nothing in that embodiment
requires that the doorbell application use the optional location service. *Id.* at
6 (citing Ex. 1001, 6:64–66, 7:9–12, Fig. 4, code (57); Ex. 1033, 41:6–42:8;
Ex. 1032 ¶ 23).

Moreover, Petitioner argues, the '739 patent specification does not
define "determining a current location," and even if every location
determination described in the specification involves use of a location
service, that alone is insufficient to redefine a term with an established
ordinary meaning in the art. Pet. Reply 7–8 (citing Ex. 1001, 4:42–44 as
defining other terms but not this one). As to Patent Owner's extrinsic
evidence, Petitioner argues that nothing in the claims or specification says
anything about determining a geographic location and that extrinsic evidence
cannot undo that drafting choice. *Id.* at 8–9.

In its Sur-reply, Patent Owner responds that Petitioner's construction
is improper because it is informed solely by the claim language, to the
exclusion of how specification describes location determination, and that
upon reading the entire '739 patent, a person of ordinary skill in the art
would have understood that "determining a location" never happens without
the aid of a "location service." PO Sur-reply 5–6 (citing Ex. 1001, 3:50–52,
5:34–36, 5:45–47, 6:64–66, 7:20–22, 7:52–53, 9:26–27, Figs. 1, 2, 4–6, 9).
Patent Owner further argues that a person of ordinary skill in the art would
have also understood that "determining a location" does indeed serve a

14

IPR2021-01374
Patent 7,956,739 B2

function, for example, to determine a method and device to be used in contacting the resident as well as the set of options presented to the user via the notification. *Id.* at 7–8 (citing Ex. 1001, 7:20–26, 9:45–9:48, claim 9; Ex. 2001 ¶¶ 72, 103, 106; Ex. 2002, 40:21–24).

Patent Owner further argues that portions of the specification that Petitioner points to as not requiring a location service also suggest the use of a location service. PO Sur-reply 9 (citing Ex. 1001, 6:50–7:12, Fig. 4). Patent Owner reiterates that "the specification discloses two embodiments— one that integrates a presence service with a monitoring and entry system, and another that adds determining a user's current location to that combination," and "[a]ll of the claims are directed to the latter embodiment." *Id.* at 10. Further arguing that the claim term should be limited to *geographic* location, Patent Owner contends that a person of ordinary skill in the art "would have recognized 'location service' as a term of art, and would have looked to the 3GPP documents and other standards documents to understand the full scope of its meaning in the context of the claims." *Id.* at 11–12 (citing Ex. 2002, 40:4–24, 41:11–42:14, 43:15–21). According to Patent Owner, a person of ordinary skill in the art in 2006 "would have had a very clear understanding of the meaning of 'location service,' and it would have entailed providing *specific and up-to-date geographic* location information, or at least an estimate, of the global position of the user's device, *expressed in latitude and longitude*." *Id.* at 12–15 (citing Ex. 2001 ¶¶ 86–91) (emphasis added).

  *b)  Our Analysis*

Under the claim construction standard applied in this proceeding, "[t]he words of a claim are generally given their ordinary and customary

IPR2021-01374
Patent 7,956,739 B2

meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citing *Phillips*, 415 F.3d at 1313). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Id.* (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1580 (Fed. Cir. 1996)). Neither of those exceptions apply here, and for the reasons discussed below, we find the plain and ordinary meaning of "determining a current location of the user" to include determining a *physical* location of a computing device associated with the user.

We begin with the claim language at issue. *TQ Delta, LLC v. DISH Network LLC*, 929 F.3d 1350, 1357 (Fed. Cir. 2019). When considering the language of the claim overall, the usage of "[determining or determine] a current location" in the claims does not in any way indicate a specific method of doing so. *See* Ex. 1001, 10:20, 10:55, 11:13. The only recitation in the independent claims related to the determined location is to store the location or to provide it to an aggregate presence service. *See id.* at 10:23, 11:14–15. There is no suggestion in the claims the location needs to be determined in a specific manner or have a specific level of granularity. *See Phillips*, 415 F.3d at 1314 ("[T]he context in which a term is used in the asserted claim" can be "highly instructive.").

Patent Owner's arguments are instead based on its reading of the '739 patent specification. According to Patent Owner, the only way that the '739 patent specification discloses to determine a location is through the use of a

IPR2021-01374
Patent 7,956,739 B2

"location service," and that mandates a narrow construction of the claim term to exclusion of all other methods of determining a location. PO Resp. 11; PO Sur-reply 6. The specification, however, makes it abundantly clear that the use of a "location service" is "optional." *See, e.g.*, Ex. 1001, 5:30–36, 5:45, 7:20–24; *see also* Ex. 2001 ¶ 83 (Dr. Shoemake agreeing that the "[u]se of the 'location service' is 'optional'"). For example, Figure 2 of the '739 patent, a portion of which is reproduced below, depicts the location service 236 using a dashed line, thus indicating that it is an optional component of the doorbell presence service architecture.



Ex. 1001, Fig. 2. Referring to the location service 236, the specification states:

> Doorbell application 232 is configured to receive notification from doorbell 202, communicate with presence server 234 and *optional location service 236* to determine a location and reach the user through computing device 204, and perform tasks for execution of action(s) selected by the user.

Ex. 1001, 5:33–38 (emphasis added). The specification further states that "[subscriber location function] 342 may be an interface function for the *optional location service 236* of architecture 200." *Id.* at 6:39–40 (emphasis added). The specification therefore leaves little doubt as to the optional nature of the location service. And Patent Owner asks that we import this

IPR2021-01374
Patent 7,956,739 B2

limitation, which the specification clearly designates as optional, into the claims. We decline to do so. *See MPHJ Tech. Invs., LLC v. Ricoh Ams. Corp.*, 847 F.3d 1363, 1369 (Fed. Cir. 2017) (affirming the Board's decision not limited to limit the claims to a feature that the specification made clear was optional); *H-W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1334 (Fed. Cir. 2014) ("The optional nature of such services negates any argument that such a limitation in the claim is implied as necessary to the invention."); *Phillips*, 415 F.3d at 1323 (warning against "importing limitations from the specification into the claims").

Patent Owner argues that its not the use of a location service that is optional but instead it is the location determination that is optional, and that when a location is determined, it *must* be done through the use of a location service. PO Resp. 8; PO Sur-reply 9. According to Patent Owner, "the specification discloses two embodiments—one that integrates a presence service with a monitoring and entry system, and another that adds determining a user's current location to that combination," and "[a]ll of the claims are directed to the latter embodiment." PO Sur-reply 10. We find no support in the specification for this position. First, we find no basis, and Patent Owner points us to none, to conclude that the claims are limited to a particular embodiment or exclude any of the disclosed embodiments. *See* Tr. 36:10–37:3, 47:3–48:5. Moreover, the specification includes instances where it mentions determining a location *without* referring to a location service. For example:

> The communications may be facilitated through SIP [session initiation protocol] messaging using IMS [IP Multimedia System] sessions. Doorbell application 232 *determines a location* of the user (resident) and notifies presence service 234,

IPR2021-01374
Patent 7,956,739 B2

> which may update presence information on HSS [Home
> Subscriber Server] 428.

Ex. 1001, 6:64–67 (emphasis added); *see also id.* at Fig. 4 (depicting the
location service as optional). Similarly, the Abstract of the '739 patent
mentions "determining the location of a user" with no reference to a location
service. *Id.* at code (57). Thus, Patent Owner's theory that the specification
clearly delineates embodiments that determine a location—necessarily using
a location service—from those that do not determine a location at all lacks
evidentiary support.

And, even if we were to agree with Patent Owner that the
specification discloses an alternate embodiment for determining a location
and that the claims are directed narrowly to that specific embodiment, we
find no support to import the requirement of a location service into a plainly
understood claim term. Even in instances where the specification discloses
determining a location using a location service, it does not mandate such
use. *See, e.g.*, Ex. 1001, 7:52–54 ("doorbell presence application 532 *may*
determine a location of the resident using a location service") (emphasis
added). After all, the purpose of determining the location of the user is
simply to establish communication between the doorbell application and the
user, for which physical location information suffices.[7] *See id.* at 5:45–48.
Moreover, as Petitioner points out, the specification emphasizes that these
descriptions are "*not to be taken in a limiting sense*, and the scope of the

---

[7] We see nothing in Patent Owner's cited portions of the specification that
suggests that a geographic location instead of a physical location is needed
to "determine a method and device to be used in contacting the resident" or
"the set of options presented to the user via the notification." PO Sur-reply
7–8 (citing Ex. 1001, 7:20–26, 9:45–9:48, claim 9).

IPR2021-01374
Patent 7,956,739 B2

present invention *is defined by the appended claims.*" Ex. 1001, 2:41–44;
*see also id.* at 10:4–13 (stating that "the subject matter defined in the
appended claims is not necessarily *limited to the specific features* or acts
described," and that those specific features and acts "are disclosed as
*example forms* of implementing the claims and embodiments") (emphasis
added). The use of a location service to determine a location is thus an
"example form of implementing the claims." Mr. Rysavy testifies that
"various methods of determining the location of a mobile device were
known at the time of the patent," and we agree that a person of ordinary skill
in the art would have understood the claims to encompass any of those
known methods of determining the location. *See* Ex. 1032 ¶¶ 12, 19.

    Patent Owner's argument, in effect, is that because there is one way of
determining a location disclosed in the purported alternate embodiment, a
person of ordinary skill in the art would have understood that to be *only* way
to determine a location and that we should limit the claims accordingly.
Tr. 44:6–23; PO Resp. 11. But our reviewing court's precedent mandates
otherwise. *See, e.g.*, *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324,
1330 (Fed. Cir. 2012) ("[I]t is . . . not enough that the only embodiments, or
all of the embodiments, contain a particular limitation to limit a claim term
beyond its ordinary meaning." (internal quotations omitted)); *CCS Fitness,
Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (stating that a
party may not narrow a claim term's ordinary meaning "simply by pointing
to the preferred embodiment or other structures or steps disclosed in the
specification or prosecution history"). Under controlling case law from the
U.S. Court of Appeals for the Federal Circuit, the specification "must have
sufficient clarity to put one reasonably skilled in the art on notice that the

IPR2021-01374
Patent 7,956,739 B2

inventor intended to redefine the claim term." *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005); *see also Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004) ("[E]ven where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope." (internal quotation omitted)). Nothing that Patent Owner points us to in the '739 patent specification shows any intent, let alone a clear one, to limit the claims in the manner proposed by Patent Owner.

Patent Owner's case law citations to the contrary do not teach otherwise and are inapposite to the facts here. For example, in *Wisconsin Alumni Research Foundation*, the court narrowly construed the term "prediction" in light of the specification because it found that "[r]eading the patent as a whole, it is clear that the claimed prediction must be capable of receiving updates," and that the specification "repeatedly and consistently" characterized the claim term in a particular way. *Wis. Alumni Research Found. v. Apple Inc.,* 905 F.3d 1341, 1351 (Fed. Cir. 2018) (citing *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1370 (Fed. Cir. 2016)). As discussed above, we are not persuaded that the specification here consistently characterizes "[determining or determine] a current location" as requiring a location service; if anything, the specification suggests that that aspect is entirely optional. Similarly, in *VirnetX*, the court agreed that "when read in light of the entire specification, the term 'secure communication link' requires anonymity" because "the addition of anonymity [was] presented as one of the primary inventive contributions of the patent" at issue. *See VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1317 (Fed. Cir. 2014). Use

IPR2021-01374
Patent 7,956,739 B2

of a location service is hardly "one of the primary inventive contributions of the ['739] patent."

In summary, based on the specification of the '739 patent, including the plain language of the challenged claims, we construe the claim term "[determining or determine] a current location" as including determining a physical location of a computing device associated with the user.[8] As a result, we need not resort to the extrinsic evidence, which, under these particular circumstances, includes a reference book and certain IETF/3GPP standards—none of which even provide a definition of the claim term—to determine the proper construction of "determining a current location." *See Phillips*, 415 F.3d at 1317 ("[W]hile extrinsic evidence can shed useful light on the relevant art, we have explained that it is less significant than the intrinsic record in determining the legally operative meaning of claim language.") (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)); *id.* at 1322–23 (stating that a tribunal may "'rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents'") (quoting *Vitronics*, 90 F.3d at 1584 n.6); *See also Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1290 (Fed. Cir. 2021) ("Given the clarity of the intrinsic evidence, resort to

---

[8] Because we decline to import the requirement of using a location service into the claim term, we also do not accept that the location has to be a geographic position or that it needs to be expressed specifically in latitude and longitude format—additional limitations that Patent Owner seeks to include based on its argument relating to the use of a location service. *See* PO Sur-reply 12–15.

IPR2021-01374
Patent 7,956,739 B2

extrinsic evidence is unnecessary."). The record therefore does not support Patent Owner's position.

### 2. Aggregate Presence Service

#### a) The Parties' Arguments

Patent Owner argues that "aggregate presence service" should be construed as "a presence service that includes location information obtained from a location service." PO Resp. 19–23. Patent Owner asserts that the presence service is "aggregate" because it includes ordinary presence information, such as "status" and "communication address," but adds "other presence markup" in the form of watcher location information. *Id.* at 19 (citing Ex. 1007, § 4.3; Ex. 2001 ¶ 101). Patent Owner contends that "presence service" was a well-known term of art, and "[t]he patentee needed a term to distinguish that presence service from one that has been updated with location information obtained from a location service," and "thus coined the term 'aggregate presence service,' acting as his own lexicographer." *Id.* at 20 (citing Ex. 1017 ¶¶ 2, 53–57, 61, 63, 65, 70, 84–86, 155, 177, 183, 200, 202, 209, 217–219, 223; Ex. 2001 ¶ 102). According to Patent Owner, the term "aggregate presence service" is used consistently in the specification to refer to a presence service that has been updated to include location information *obtained from a location service*. *Id.* at 20–22 (citing Ex. 1001, 7:13–30, 7:40–61, 9:42–61, Figs. 5, 6, 9; Ex. 2001 ¶¶ 103–105). Patent Owner contends that, once updated with location information, the "aggregate presence service" then uses that information to perform other tasks, such as providing the resident a list of responsive actions, some of which are based on the location information. *Id.* at 22 (citing Ex. 1001, 9:45–62; Ex. 2001 ¶¶ 103–105).

IPR2021-01374
Patent 7,956,739 B2

Petitioner urges us not to adopt Patent Owner's proposal because it requires that the aggregate presence service receive location information from a location service, which is contrary to the claim language and specification. Pet. Reply 20–21 (citing Pet. § II.A.2; Ex. 1032 ¶¶ 30–37). Moreover, Petitioner argues, Patent Owner offers no evidence that location information obtained from a location service would differ from location information from some other source. *Id.* at 21 (citing Ex. 1033, 101:21–102:21; Ex. 1032 ¶ 33). Petitioner also points out that there is no dispute that "presence-related information" already includes location information. *Id.* (citing Ex. 1033, 112:6–10; Ex. 1032 ¶¶ 34–36). According to Petitioner, an ordinarily skilled artisan would have understood "aggregate presence service" to mean a service that receives, stores, and provides presence-related information. Pet. 9 (citing Ex. 1017 ¶¶ 68–71).

In its Sur-reply, Patent Owner responds that, even if a "presence service" can include location information, the patentee coined a term to distinguish aggregate presence service from mere presence service, as a presence service that includes geographic location information *obtained from a location service*. PO Sur-reply 15. Patent Owner argues that "[t]he fact that a 'presence service' may, outside the context of the '739 patent, include location information sourced from a location service cannot undo the patentee's lexicography." *Id.* Patent Owner provides the following table to illustrate its claimed distinction:

IPR2021-01374
Patent 7,956,739 B2

| aggregate presence service | presence service |
|---|---|
| includes at least:<br><br>1. status<br>2. geographic location sourced from a location service<br><br>**can** also include:<br><br>3. communication address (e.g., IP address)<br>4. other presence markup (e.g., geographic location sourced from the user reporting its own location) | includes at least:<br><br>1. status<br><br>**can** also include:<br><br>2. communication address (e.g., IP address)<br>3. other presence markup (e.g., geographic location sourced from a location service, or sourced from the user reporting its own location) |

*Id.* at 16 (citing Ex. 2001 ¶ 66; Ex. 1006 § 6.1.1; Ex. 1007 § 4.3).

   b) *Our Analysis*

   For the reasons below, we construe "aggregate presence service" to mean "a service that receives, stores, and provides presence-related information," and we disagree with Patent Owner that such a service needs to include geographic location information obtained from a location service. The parties agree that that "presence-related information" already includes location information. Patent Owner's proposal would have us read the requirement of using a location service into the claims, which, as discussed above, we decline to do on the record before us. As with "determining a current location," discussed in Section III.C.1 above, we see no lexicographic definition or clear intent in the specification defining "aggregate presence service" in the manner that Patent Owner argues. To be sure, the '739 patent specification does define other terms. *See, e.g.,* Ex. 1001, 4:42–44 ("The term computer readable media as used herein refers to both storage media and communication media."). But the specification

IPR2021-01374
Patent 7,956,739 B2

does not define "aggregate presence service" in any way, much less using such express language.  The portions of the specification that Patent Owner points us to (PO Resp. 20–22) as defining the claim term fall well short of what is required under Federal Circuit precedent to show a lexicographic definition.  In relevant part, all the specification says is that a "doorbell presence application" may provide an "[a]ggregate presence service" with information regarding a user's location, and that "aggregate presence service 534 updates a presentity store 528 and enables watcher client application 504 to provide the notification to the user." *See* Ex. 1001, 7:20–26, Fig. 5; *see also id.* at 7:40–61, 9:42–61, Figs. 6, 9.  There is no disclosure in the specification distinguishing the term "aggregate presence service" from the term "presence service" in a specific way, let alone any other disclosure requiring the use of a location service in the manner that Patent Owner argues.  The record therefore does not support Patent Owner's position.

3.  *Other Claim Terms*

Petitioner also proposes constructions for "presentity," "personal presentity," and "watcher."  Pet. 7–10.  In particular, Petitioner contends, a person of ordinary skill in the art "would have understood 'presentity' to mean an entity that has presence information associated with it, such as information regarding whether a visitor is present at a resident's door," and "would have understood 'personal presentity' to mean a presentity that is associated with the presence of a person (*e.g.*, a human visitor)." *Id.* at 7–8 (citing Ex. 1017 ¶¶ 59–63).  Petitioner also contends a person of ordinary skill in the art "would have understood 'watcher' to mean an entity (person or otherwise) that requests and/or receives presence information regarding a

IPR2021-01374
Patent 7,956,739 B2

presentity." *Id.* at 8–9 (citing Ex. 1017 ¶¶ 64–67). Patent Owner does not address construction of any of these claim terms. *See generally* PO Resp.

We determine we need not explicitly construe any of these remaining claim terms to resolve Petitioner's patentability challenges. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Matal*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (noting that "we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

D. *Overview of the Asserted Prior Art*

1. *Oh (Ex. 1004)*

Oh is titled "Intelligent System for Identifying Visitor and Providing Communication Service Using Mobile Terminal and Method Thereof," and relates to "an intelligent system for identifying a visitor and providing a communication service by using a wireless communication terminal based on a session initiation protocol (SIP) in a home gateway system." Ex. 1004, codes (54), (57), 1:9–15. Oh discloses an intelligent system that uses a home gateway system to determine the location of a resident in real time when the bell of a video door phone is activated, and providing a communication service to the resident using a wireless terminal, including transmitting video signal to identify the visitor. *Id.* at 4:41–50.

IPR2021-01374
Patent 7,956,739 B2

Figure 1 of Oh is reproduced below.



Figure 1 illustrates a system for identifying a visitor and providing a communication service using a wireless communication terminal.  Ex. 1004, 7:35–39.  When a visitor doorbell event occurs at video door phone device 10, home gateway device 20 communicates with the resident's wireless communication terminal 30-1 to determine whether the resident is at home, and depending on whether the resident is at home, allows the resident to view images of the visitor and communicate with the visitor either through (i) visitor identifying and communicating terminals 30-2 to 30-5 at home, e.g., a tablet personal computer, PDA, television-phone, IP set-top box, web-pad, or (ii) wireless terminal 30-1.  *Id.* at 8:13–48; *see also id.* Figs. 4–7 (flowcharts showing methods for identifying a visitor and providing a communication service under different scenarios).

APPX00028

IPR2021-01374
Patent 7,956,739 B2

Figure 2 of Oh is reproduced below.



Figure 2 is a block diagram illustrating Oh's system showing video door phone device 10, home gateway device 20, and terminals 30-1 to 30-7. Ex. 1004, 7:49–54. Oh's home gateway device 20 includes door phone interface controller/processor 22 and door phone application processor 23 connected to video door phone 10 for processing a bell signal event, and includes terminal recognition service controller 25 for locating a resident's wireless terminal 30-1 when a visitor bell is activated. *Id.* at 8:54–59. Oh's home gateway also includes location information managing controller 24 and visitor communication proxy server controller 21 for managing and connecting to visitor identifying and communication terminals 30-1 to 30-7. *Id.* at 8:59–62. Terminals 30-2–30-7 include (1) visitor communication terminal application controller 31 for registering and updating a location of a terminal, transmitting/receiving SIP messages, and processing Real-Time Transport Protocol ("RTP") packets; (2) user interface processor 32 for sensing and processing events inputted from a user, and performing

IPR2021-01374
Patent 7,956,739 B2

interactions with the controller 31; and (3) multimedia interface processor 33 for encoding audio data inputted from a microphone, and decoding and reproducing received visitor's voice/video data. *Id.* at 9:22–31. Wireless communication terminal 30-1 includes similar components, but also includes terminal recognition controller 44 which interfaces with terminal recognition server controller 25 for detecting the location of the wireless communication terminal. *Id.* at 9:41–53.

   2.   *Forbes (Ex. 1005)*

   Forbes is titled "Image Exchange for Image-Based Push-To-Talk User Interface," and relates to "image exchange in wireless communications devices capable of push-to-talk service." Ex. 1005, codes (54), (57), 1:5–9. Forbes describes a visual interface for a push-to-talk ("PTT") terminal that displays user images of participants in a PTT conference. *Id.* at code (57).

   Figure 4 of Forbes is reproduced below.



**FIG. 4**

Figure 4 is a block diagram illustrating the basic architecture and service elements for PTT services. Ex. 1005, 2:28–29. Forbes's push-to-talk over

IPR2021-01374
Patent 7,956,739 B2

cellular ("PoC") network 60 comprises user terminal 20 with PTT functionality, PoC server 62, Presence Server (PS) 66, and IP multimedia subsystem ("IMS") core 40. *Id.* at 4:37–5:28. The Presence Server maintains the presence status of PTT clients, for example, whether a client is reachable, unavailable, offline, or in do-not-disturb status, and supports publication of such presence information to other clients. *Id.* at 5:18–24. During a group PTT session, conference participants may connect to the same PoC server 62 using SIP. *Id.* at 5:29–31.

   3.   *TS23.141 (Ex. 1006)*

   TS23.141 is a Technical Specification published by the 3rd Generation Partnership Project ("3GPP"), detailing the "stage 2 description (architectural solution and functionalities) for the Presence Service," which "provides the ability for the home network to manage presence information of a user's device." Ex. 1006, 5–6, 8, § 4.1. TS23.141 describes a Presence Server as a network entity residing in the presentity's home network and responsible for managing presence information on behalf of a presence entity. *Id.* at 7, 12, §§ 3.1, 5.1, Fig. 4.2-1. TS23.141 explains that the Presence Server is able to receive and manage presence information that is published by users and is "responsible for composing the presence-related information for a certain presentity from the information it receives from multiple sources." *Id.* at 12, § 5.1. The Presence Server also allows "watchers" to request and subscribe to presence information that the watcher is interested in for a given presentity. *Id.* at 13, § 5.1. The Presence Server is also able to generate notifications to such watchers, providing them with the presence information of a presentity whenever it is modified. *Id.*

IPR2021-01374
Patent 7,956,739 B2

TS23.141 further explains that the Presence Server supports SIP-based communications for publishing presence information. *Id.* at 7, 13.

### E. *Obviousness in view of Oh*

Petitioner contends that claims 1–3 and 6–11 are rendered obvious by Oh. Pet. 3, 10–29. For the reasons that follow, we are persuaded Petitioner has shown by a preponderance of the evidence that claims 1–3 and 6–11 would have been obvious over Oh.

#### 1. *Independent Claim 1*

##### a) *"A method for providing distributed access services between a watcher and at least one personal presentity, the method comprising:"*

Petitioner contends Oh discloses a method for enabling a resident using a terminal to wirelessly communicate with a visitor via a video door phone, where the resident receives information indicating the presence of the visitor at the video door phone. Pet. 11–12, 17 (citing Ex. 1004, 4:40–56, 8:26–40, Figs. 1, 2). Petitioner contends that the video door phone is a personal presentity because it has presence information associated with it, i.e., information whether a visitor is present at the door. *Id.* at 12.

Patent Owner does not present arguments as to the preamble of claim 1. *See generally* PO Resp. Based on the entirety of the record and for the reasons explained by Petitioner, we determine that Petitioner has proved by a preponderance of the evidence that, to the extent the preamble is limiting, Oh teaches the preamble of claim 1.

IPR2021-01374
Patent 7,956,739 B2

   b)  *"receiving, at a computing device, an alert from a personal
       presentity;"*

Petitioner contends Oh teaches this limitation because Oh provides
that, when a visitor activates a bell button on the video door phone, the video
door phone sends a doorbell signal to the home gateway device. Pet. 11–12,
18 (citing Ex. 1004, 4:44–50, 6:15–18, 8:54–57, 10:27–32, 12:5–10,
13:42–45, 15:36–38, Figs. 1, 4–7).

Patent Owner does not present arguments as to this limitation. *See
generally* PO Resp. Based on the entirety of the record and for the reasons
explained by Petitioner, we determine that Petitioner has proved by a
preponderance of the evidence that Oh teaches this limitation.

   c)  *"determining a current location of the watcher;"*

Petitioner contends Oh teaches this limitation because Oh discloses
that the home gateway device determines the current location of the resident
by determining the location of the resident's wireless communication
terminal, which the resident always carries. Pet. 12–13, 18 (citing Ex. 1004,
4:43–44, 5:1–4, 5:35–38, 6:27–34, 6:53–60, 8:26–33, 9:1–4, 9:45–48, 9:54–
10:22, 10:35–40, 12:13–16, 13:50–53, 16:17–20, Figs. 3–7). In its Reply,
Petitioner further contends that Oh broadly discloses "determining a location
of a resident in real time" by "detecting a location of the resident's wireless
communication terminal." Pet. Reply 10 (citing Ex. 1004, 4:43, 6:30–31,
6:57–60, 10:15–23). According to Petitioner,

   Oh describes specific embodiments in which the location of the
   user's wireless terminal is determined based on whether the
   home gateway device can communicate with the wireless
   terminal, or based on the IP address assigned to the wireless

33

IPR2021-01374
Patent 7,956,739 B2

> terminal by the cellular network as the wireless terminal moves
> between coverage areas.

*Id.* (citing Ex. 1004, 7:20–27, 9:62–10:23, 10:36–47). Petitioner contends that Oh's summary of the invention discloses "determining a location of a resident," and that "Oh further discloses that this determination is made by detecting the physical location of the resident's wireless terminal in real time for purposes of establishing communications between the resident and a visitor." *Id.* at 11 (citing Ex. 1004, 6:27–31, 6:47–60; Ex. 1017 ¶¶ 95–98). Petitioner further contends that Oh also discloses that the physical location of the user's wireless terminal is "dynamically obtained" based on the IP address assigned to the wireless terminal by packet data serving nodes ("PDSN") within the cellular network. *Id.* at 12 (citing Ex. 1004, 7:19–27, 9:62–10:23; Ex. 1017 ¶¶ 102–104; Ex. 2002, 14:2–7, 22:10–14, 44:9–17). According to Petitioner, "[d]etermination of a geographically assigned IP address thus constitutes determining a physical 'location of the user.'" *Id.* (citing Ex. 2009, 168).

Petitioner asserts that, in the district court litigation, Patent Owner's position has been that the claims encompass determination of a current location of the user by using a "***cell phone tower, or Wi-Fi signal****s*," and also by determining "whether a user is home or away." Pet. Reply 15 (citing Ex. 1034 (Patent Owner's infringement contentions), 6, 7, 9). According to Petitioner, those are binding admissions that Oh teaches this limitation. *Id.* at 15–16.

Lastly, Petitioner contends that a person of ordinary skill in the art would have modified Oh to use a global positioning system ("GPS") to determine and store the location of the resident's mobile device, and GPS is

IPR2021-01374
Patent 7,956,739 B2

a location service that determines the geographical location of a mobile device.  Pet. Reply 16 (citing Ex. 1017 ¶ 106).

Patent Owner, relying on its proposed claim construction, argues that Oh does not teach "[determining or determine] a current location."  PO Resp. 30–33.  Patent Owner contends that "Oh makes no mention of a location service, nor does Oh teach anything about a watcher/user's geographic location."  *Id.* at 30.  Patent Owner argues Oh "simply discloses the binary home or away assessment made by the terminal recognition modules."  *Id.* at 31.  Patent Owner further contends that "Oh's disclosure of the transmission of a message to a particular network address to determine if a device responds would not be viewed by a [person of ordinary skill in the art] as determining the location," and that "Oh's system is fully unaware of geographic location."  *Id.* at 31–33 (citing Ex. 2001 ¶¶ 197–202).

In its Sur-reply, Patent Owner further argues that "Oh's system acts like a call routing system using a[] SIP proxy server in a gateway to determine how to route calls," and "[t]his is far from using a location service to determine a user's geographic location, as required by the claims of the '739 patent, properly interpreted."  PO Sur-reply 16–18 (citing Ex. 1004, 4:16–36, 6:47–52, 9:62–10:22, 10:41–62, 12:16–35, 13:53–14:3, Fig. 3; Ex. 2001 ¶¶ 61, 120, 125, 127–130, 139–143, 149–152).[9]  Patent Owner reiterates that "[t]he Oh system never knows or cares about the geographic locations of any of its components—the home gateway, the wireless communication device, or the various visitor identifying and communicating

---

[9] We consider Patent Owner's citations to Exhibit 1001 to be an inadvertent error where Patent Owner intends to cite to Oh, which is Exhibit 1004.  *See* PO Sur-reply 17–18.

IPR2021-01374
Patent 7,956,739 B2

terminals," and that "[t]he decisions made by the gateway are fully based on IP addresses and whether the wireless communication terminal responds to a ping-like message." *Id.* at 18–19 (citing Ex. 2001 ¶¶ 121, 130, 145–148, 152, 198–204).

Patent Owner's arguments are based primarily on its proposed construction of "determining a location" as requiring the use of a location service to determine a geographic location. We do not adopt Patent Owner's construction, and therefore, find those arguments unpersuasive. Under the proper construction of the term as including determining a *physical* location of a computing device associated with the user, we find Oh discloses this limitation. As Petitioner points out, Oh states in its "Summary of the Invention" that

> [i]t is . . . an object of the present invention to provide an intelligent system for identifying a visitor and providing a communication service using a wireless communication terminal *by determining a location of a resident in real time* at a home gateway system when a visitor activates a bell of a video door phone connected to the home gateway system, *noticing a bell activation event to the resident* by connecting to a terminal capable of real-time communication such as a wireless communication terminal based on SIP when the resident is not home, and transmitting video signal to identify a visitor by viewing images of the visitor . . . .

Ex. 1004, 4:40–50 (emphasis added). Oh's purpose in determining a location of the resident is to establish communications between the resident and a visitor. *Id.* at 6:27–31, 6:53–60. This is consistent with the invention claimed by the '739 patent. *See, e.g.*, Ex. 1001, claim 1 (directed to a "method for providing distributed access services between a watcher and at least one personal presentity").

IPR2021-01374
Patent 7,956,739 B2

Oh discloses using a request message to determine whether the user is home or away based on whether it receives a response from the user's wireless terminal. *See* Ex. 1004, 10:37–47, 12:16–24, 13:53–61, Fig. 4; *see also* PO Sur-reply 16–17. If the user's terminal responds, the user is determined to be at home, and if not, the user is determined to be away. *See* Ex. 1004, 10:48–62, 12:14–26, Figs. 4, 5. We agree with Petitioner that the user being located at home is a physical location of the user, and the user being located away from home is also a physical location of the user. Thus, Oh teaches determining a current location of the user.

Moreover, Oh discloses that, when the wireless terminal moves from one cellular area to another and receives a new IP address from a new PDSN, it "dynamically informs the newly received IP address to the home gateway device." *See* Ex. 1004, 7:19–27, 9:62–10:23. We agree with Petitioner that using the geographically assigned IP address to determine the user's location also teaches determining a current location of the user.

Lastly, we are also persuaded that a person of ordinary skill in the art would have been motivated to modify Oh's system to determine and store GPS location data associated with the wireless communication terminal.[10] Pet. 19; Pet. Reply 16 (citing Ex. 1017 ¶ 106). Mr. Rysavy testifies that "technology that used GPS to send an 'alert' when 'the location of' a cellular phone 'enters or leaves [a] defined area'" was widely available at the time of

---

[10] Although the Petition presents this contention with regard to the storing limitation (Pet. 19), we determine that the contention equally applies to the determining limitation given that that GPS location data must first be determined for it to be stored. *See* Pet. Reply 16 n.7 (citing *Arthrex, Inc. v. Smith & Nephew, Inc.*, 935 F.3d 1319, 1328 (Fed. Cir. 2019); *Sirona Dental Sys. GmbH v. Institut Straumann AG*, 892 F.3d 1349, 1356 (Fed. Cir. 2018)).

the claimed invention, and that a person of ordinary skill in the art would have found it obvious to take advantage of such GPS capabilities.  Ex. 1017 ¶ 106 (citing Ex. 1016).  He further testifies that a person of ordinary skill in the art would have understood that "such GPS capabilities could have been built into the wireless terminal device disclosed in Oh, and could readily have been used to report the location of that device to the home gateway device, which would store that location data, as claimed."  *Id.*  We credit Mr. Rysavy's testimony because it is supported by the cited evidence.[11]

Patent Owner's argument that "[t]here is nothing in Oh that suggests its system would have benefited from incorporation of resident geographic location information," and that the "[l]ack of GPS-capability is not a shortcoming that a [person of ordinary skill in the art] would have recognized in Oh" is not persuasive.  PO Resp. 35–36 (citing Ex. 2001 ¶ 204).  Mr. Rysavy testifies that a person of ordinary skill in the art would have been motivated to take advantage of GPS capabilities already available in the cellular phone to report the location of the device when the phone entered or left a defined area, such as the resident's home.  Ex. 1017 ¶ 106 (citing Ex. 1016); *see also* Ex. 2002, 59:3–21, 60:9–11 (providing additional

---

[11] We disagree with Patent Owner that Petitioner was required to "identify [Exhibit] 1016 as among the prior art references upon which it bases either of its two asserted grounds of unpatentability," in order to rely on it for purposes of its obviousness analysis.  PO Resp. 34.  Petitioner here relies on Exhibit 1016 as evidence that a skilled artisan would have known about GPS and been motivated to combine GPS information with Oh's system.  *See* Ex. 1017 ¶ 106 (testifying that this technology was "widely available in cellular phones prior to September 2006").  The Federal Circuit has found reliance on such evidence permissible even where it is not a basis for a petitioner's asserted ground of unpatentability.  *See Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1337 (Fed. Cir. 2020).

IPR2021-01374
Patent 7,956,739 B2

reasons why Oh would have benefited from incorporation of the resident's
GPS information, such as allowing Oh's devices to work on other cellular
networks or to providing more precise location information that could enable
additional features in Oh's system).  We credit Mr. Rysavy's testimony and
find that Petitioner has provided sufficient reason why one of ordinary skill
in the art would have combined GPS location information with Oh's system
in the manner asserted by Petitioner.  *See KSR*, 550 U.S. at 420 ("any need
or problem known in the field of endeavor at the time of invention and
addressed by the patent can provide a reason for combining the elements in
the manner claimed").

Patent Owner also argues that, because none of the references actually
mention GPS, a person of ordinary skill in the art would not have "known
enough about GPS to have the technical wherewithal to combine it with
Oh."  PO Resp. 34–35.  But, as Mr. Rysavy testifies, GPS capabilities were
already built into cellular phones, i.e., the wireless terminal device disclosed
in Oh, and "could readily have been used to report the location of that device
to the home gateway device."  Ex. 1017 ¶ 106; *see also* Ex. 2002, 58:22–25
(testifying that "at the time GPS was commonly available in handsets, so
taking advantage of that information would have been readily available,"
and "a very simple modification to make").  We find this testimony
persuasive, and further, Patent Owner has provided no reason for us to
conclude that such a modification would have been uniquely challenging or

IPR2021-01374
Patent 7,956,739 B2

otherwise beyond the skill level of an ordinarily a skilled artisan.[12]  *See*

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1161–62 (Fed.

Cir. 2007) (explaining that Leapfrog had not presented evidence that the

proposed modification was "uniquely challenging or difficult for one of

ordinary skill in the art" or "represented an unobvious step over the prior

art").

    Based on the entirety of the record, we determine that Petitioner has

proved by a preponderance of the evidence that Oh teaches this claim

limitation.

> d)    *"providing a notification associated with the alert to the
>       watcher; and"*

    Petitioner contends Oh teaches this limitation because Oh discloses

that the home gateway device sends a notification of the bell activation event

to a visitor identifying and communicating terminal, which presents the

notification to the resident. Pet. 13–14, 18–19 (citing Ex. 1004, 4:44–48,

6:15–20, 6:34–65, 8:33–45, 12:36–40, 14:4–10, Figs. 4–6).  For example,

Petitioner contends, when the home gateway determines that the resident is

away from home, Oh's gateway sends the notification to the resident's

wireless terminal if no other terminal has been registered to receive such

notifications.  *Id.* at 13–14 (citing Ex. 1004, 9:38–40, 12:24–35,

13:62–14:3).

    Patent Owner does not present arguments as to this limitation.  *See*

*generally* PO Resp.  Based on the entirety of the record and for the reasons

---

[12] To the extent Patent Owner's argument is directed at physically
combining GPS capabilities into Oh's system, Petitioner is not required to
make such a showing as part of its obviousness ground. *See, e.g.*, *In re
Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012).

IPR2021-01374
Patent 7,956,739 B2

explained by Petitioner, we determine that Petitioner has proved by a preponderance of the evidence that Oh teaches this limitation.

     *e)*   *"storing data related to a current location of the watcher."*

Petitioner contends Oh teaches or at least suggests this limitation because Oh provides that the home gateway device stores location information of the wireless communication terminal, which the resident always carries. Pet. 12–13, 19–20 (citing Ex. 1004, 5:1–6, 6:29–34, 6:47–52, 7:19–25, 9:5–8, 9:54–10:22, 12:27–35, Fig. 3). Petitioner further contends that a person of ordinary skill in the art "would have recognized that the home gateway device could readily have been modified to store GPS location data associated with the wireless communication terminal." *Id.* at 19 (citing Ex. 1017 ¶ 106).

Patent Owner argues that "Oh does not teach the use of a location service to obtain the watcher's geographic location information," and therefore, "does not do anything with 'current location' information, let alone 'store' it." PO Resp. 33. Patent Owner further argues that Oh only discloses contacting the proper terminal based on its determination that a resident is or is not at home, and does not disclose storing that information. *Id.* at 33–34 (citing Ex. 1004, 1:19–22; Ex. 2001 ¶ 203). Patent Owner also argues that Petitioner fails to explain a rationale for modifying Oh to incorporate GPS technology. *Id.* at 34–36.

For the reasons discussed above with regard to the determining limitation (*see supra* § III.E.1.c), we also do not find Patent Owner's arguments persuasive as to this storing limitation. Oh discloses that when user's wireless device moves from packet data service node to another within the cellular network, the device "dynamically informs the newly

IPR2021-01374
Patent 7,956,739 B2

received IP address to the home gateway device." Ex. 1004, 7:19–27; *see also id.* at 9:62–10:18 ("After receiving the new IP address, the wireless communication terminal 30-1 transmits a contact address update request message (SIP REGISTER: update) to the home gateway device 20 by putting the new IP address in the contact address update request message at Step S307." (referring to Fig. 3)). Oh further discloses that "the home gateway device 20 *changes the contact address* of the wireless communication terminal 30-1 and transmits a response message to the wireless communication terminal 30-1 at step S308." *Id.* at 10:18–22 (emphasis added). Oh discloses storing the geographically assigned IP address, and therefore, teaches the claim limitation.

For the reasons discussed above with regard to the determining limitation (*see supra* § III.E.1.c), we are also persuaded that a person of ordinary skill in the art would have found it obvious to modify Oh's home gateway to determine and store GPS location data associated with the wireless communication terminal. *See* Ex. 1017 ¶ 106.

Based on the entirety of the record, we determine that Petitioner has proved by a preponderance of the evidence that Oh teaches this claim limitation.

> *f)   Conclusion as to Claim 1*

We have reviewed the parties' evidence and argument, and based on the complete record, we find that Petitioner has shown by a preponderance of the evidence that Oh teaches each of the limitations of claim 1.

### 2.   Independent Claim 8

Claim 8 recites "[a] computer-readable storage medium storing computer executable instructions for providing a monitoring and entry

42

IPR2021-01374
Patent 7,956,739 B2

system presence service, the instructions configured to perform at least the following" operations: "in response to a trigger event, receiving an indication signal from an interface device," "determining a current location of a user," "providing the user a notification associated with the trigger event;" and "activating an application associated with the monitoring and entry system presence service." Ex. 1001, 10:49–59.

Petitioner contends that Oh teaches or suggests each of these limitations and provides an element-by-element analysis. Pet. 11–16, 24–26. Petitioner contends that Oh's home gateway device stores computer-executable instructions for a service for identifying and communicating with a visitor to a property. *Id.* at 24–25 (citing Ex. 1004, 4:44–48, 4:62–66, 6:15–22, 8:33–9:21, 16:1–9, 16:26–30, Figs. 1, 2). Petitioner further contends that Oh's video door phone teaches an "interface device" because it provides an interface between the visitor and Oh's home gateway. *Id.* at 12. According to Petitioner, the doorbell signal received by the home gateway is an "indication signal" received in response to the bell activation event, i.e., a "trigger event." *Id.* at 12, 25 (citing Ex. 1004, 4:44–50, 6:15–18, 8:54–57, 10:27–32, 12:5–10, 13:42–45, 15:36–39, Figs. 1, 4–7). Petitioner further contends that Oh teaches activating an application to provide (a) video of the visitor captured by the video door phone to the resident, (b) voice communication between the visitor and the resident through the video door phone, (c) an image of the visitor to the resident, or (d) causing a recording of the visitor's voice and image to be transmitted to the resident. *Id.* at 26 (citing Ex. 1017 ¶ 135). For the remaining limitations of claim 8, Petitioner relies on its arguments and evidence relating to claim 1. *Id.* at 25–26.

IPR2021-01374
Patent 7,956,739 B2

Patent Owner does not present separate arguments for claim 8. *See generally* PO Resp. For the reasons discussed above with regard to claim 1, and because Petitioner sufficiently shows that Oh teaches the remaining limitations of claim 8, we determine that Petitioner has established by a preponderance of the evidence that Oh teaches each of the limitations of claim 8.

### 3.    *Dependent Claim 2*

Dependent claim 2 adds to claim 1 the further step of "providing the watcher a plurality of actions to select in response to the alert." Ex. 1001, 10:24–26. Petitioner argues that dependent claim 2 would have been obvious in view of Oh. Pet. 14–15, 20–21. Petitioner contends that Oh discloses providing the resident, in response to a visitor activating the doorbell, the options of (a) allowing a connection to communicate with the visitor, (b) disallowing such connection, or (c) reproducing a recording of the visitor's voice and image. *Id.* at 20–21 (citing Ex. 1004, 5:38–42, 5:64–6:2, 6:10–14, 6:20–26, 6:43–45, 7:18–19, 9:12–21, 11:1–49, 12:41–13:20, 14:31–64, 15:52–67, Figs. 4–7; Ex. 1017 ¶ 110); *see also id.* at 15 (citing, *inter alia*, Ex. 1004, 8:37–40, 8:45–48, 10:63–11:7, 12:41–54, 14:4–19, 15:22–67, Fig. 7). Petitioner additionally contends that a person of ordinary skill in the art would have found it obvious from Oh's disclosure to provide the user with a plurality of actions to select from in response to an alert. *Id.* at 20 (citing Ex. 1017 ¶ 110).

Patent Owner responds that "Oh merely contemplates the user selecting a device to use for communicating with the visitor," and that is not a plurality of "actions" as required by claim 2. PO Resp. 40–41 (citing Ex. 1004, 8:33–40; 11:12; 11:7–10, 12:35–40, 13:61–14:19, Fig. 1). Even

44

IPR2021-01374
Patent 7,956,739 B2

if, as alleged by Petitioner, the act of allowing a connection to communicate in real time constitutes a "selection of an action," that single action, by itself, Patent Owner argues, does not constitute selection of an option from a *plurality* of available options. *Id.* at 42. Patent Owner contends that disallowing a connection "clearly constitutes *inaction*, and not an 'action' as required by claim 2," and that Oh does not disclose an action that results in disallowing a connection. *Id.* at 42–43. As to Petitioner's third alleged action for this limitation, Patent Owner argues that reproducing a recording of the visitor is "equally inapplicable as a selectable action" because claim 2 explicitly requires that the "selection" occur *in response to* the alert and Oh teaches reproducing a recording when the resident is unable to use a real-time identifying and communicating function. *Id.* at 43–44 (citing Ex. 1004, 4:57–61, 6:23–26). Patent Owner thus contends that, "at best, Oh only discloses a single 'action' for a user to select in response to the alert: selection of a communicating terminal to allow a visitor communication." *Id.* at 44.

Petitioner persuasively shows that Oh teaches or suggests this limitation. First, as Patent Owner acknowledges, Oh discloses allowing a connection to communicate with a visitor in real time in response to a doorbell notification, which constitutes a selection of an action in response to an alert. *See, e.g.*, Ex. 1004, 11:1–49, 14:11–30. Second, we agree with Petitioner that Oh's disclosure of providing a user the option to reproduce recorded audio and video of the visitor teaches providing another action that the user may select in response to an alert. *See* Pet. 15 (citing, *inter alia*, Ex. 1004, 15:22–67, Fig. 7), 21 (citing, *inter alia*, Ex. 1004, 6:10–14,

IPR2021-01374
Patent 7,956,739 B2

15:52–67, Fig. 7); Pet. Reply 24–25 (citing Ex. 1004, 15:36–54; Ex. 1032
¶¶ 62–68).

According to the '739 patent specification, "obtain[ing] a still image
or video of the person at the door" is one of the selections that may be
provided to the user in response to a doorbell notification. *See* Ex. 1001,
7:4–9. Oh discloses that, if a recording function is set and a visitor activates
the door bell, the video door phone device "outputs a recorded guide
message" and "receives voice and images of the visitor," which are then
stored at the home gateway device. Ex. 1004, 15:21–51. Oh further
discloses a "reproduce button" that the resident can select to view the
recorded video. *Id.* at 15:51–67. Thus, Oh teaches providing the resident
with a reproduce button to obtain and view video of the visitor, which is an
action provided in response to the alert.

Patent Owner argues that Oh's reproduce functionality is not provided
"in response to" the doorbell alert but instead is *only* available when the
resident is unable to use the voice communication function. PO Resp.
43–44. Patent Owner explains that "[p]layback, as is the case with
voicemail on a traditional phone, is intended to be invoked at a later time
and not in response to the doorbell alert itself." *Id.* at 44. Patent Owner
therefore argues that the reproduce "action" is not provided in the manner
required by claim 2. We disagree.

Claim 2 merely requires "providing the watcher a plurality of actions
to select in response to the alert." Ex. 1001, 10:24–26. As Petitioner points
out, there is no temporal limitation in the claim that requires the plurality of
actions to be provided to the watcher contemporaneously. Pet. Reply 24.
The claim merely requires that the action be provided "in response to the

alert," and Oh's watcher is given the option to play back recorded video of
the visitor only "*if* a visitor activates" the doorbell. *Id.* (citing Ex. 1004,
15:36–54; Ex. 1032 ¶ 62). We are therefore persuaded that the reproduce
functionality necessarily is provided to the user "in response to" the doorbell
alert and teaches one more "action" required by claim 2.

Alternatively, we are persuaded by Petitioner's argument that, based
on Oh's disclosure, an ordinarily skilled artisan would have found it obvious
to provide the resident with multiple options in response to the alert. Pet. 20
(citing Ex. 1017 ¶ 110). Mr. Rysavy testifies that in view of Oh's express
disclosure of providing the resident with the option of allowing a connection
in response to a notification of a bell activation event, a person of ordinary
skill in the art would have found it obvious to provide the resident with
actions to select, which may include allowing or disallowing a
communication connection with the visitor, or reproducing a recording of
the visitor. Ex. 1017 ¶ 110; Ex. 1032 ¶ 67. He further testifies a person of
ordinary skill in the art would have recognized the benefit of facilitating the
resident's selection from among multiple actions by providing the resident
"a plurality of actions to select" in response to a doorbell event. Ex. 1032
¶ 68. We find Mr. Rysavy's testimony credible because it is based on Oh's
express disclosure of one selectable action and a straightforward
modification of Oh's system. And, contrary to Dr. Shoemake's testimony,
we find nothing in Oh that requires "that a user have a *single* type of
communication with the visitor," or that "communication is fixed by Oh."
Ex. 2001 ¶ 221 (citing Ex. 1004, 11:1–3, 11:18–49, 16:26–29); *see also*
Ex. 1032 ¶ 67.

IPR2021-01374
Patent 7,956,739 B2

Because Oh teaches or fairly suggests at least two actions provided to the user to select from in response to the alert, we determine that Petitioner has established by a preponderance of the evidence that Oh teaches the limitation recited in claim 2.

### 4. Dependent Claims 3, 6, 7, and 9–11

Petitioner argues that dependent claims 3, 6, 7, and 9–11 would have been obvious in view of Oh. Pet. 11–16, 20–24, 26–29. Petitioner provides analysis detailing where it contends Oh teaches or suggests each of the additional limitations of dependent claims 3, 6, 7, and 9–11. *Id.*

Claim 3 depends from claim 2 and recites the further step of "activating an application in response to a selection by the watcher, wherein the application includes at least one of: a voice communication through the personal presentity, a video communication through the personal presentity, an image acquisition application, and an electronic control application." Ex. 1001, 10:27–33. Petitioner contends that Oh teaches the additional limitation of claim 3 because it discloses activating an application to provide (a) video of the visitor captured by the video door phone to resident, (b) voice communication between the visitor and resident through the video door phone, (c) an image of the visitor to the resident, or (d) a recording of the visitor's voice and image to be transmitted to the resident. Pet. 21–23 (citing Ex. 1004, 5:38–42, 5:64–6:2, 6:20–22, 7:18–19, 9:12–19, 11:18–49, 12:41–13:20, 14:31–64, 15:52–67 Figs. 4–7; Ex. 1017 ¶ 116); *see also id.* at 14–16. Petitioner further contends that it would have been obvious to modify Oh to allow the resident to "buzz" the visitor in, which Oh describes as prior art. *Id.* at 22 (citing Ex. 1004, 3:8–11; Ex. 1017 ¶ 116).

IPR2021-01374
Patent 7,956,739 B2

Claim 6 depends from claim 1 and further recites "wherein the personal presentity includes at least one of: a building entry system, a security monitoring system, and an equipment monitoring system." Ex. 1001, 10:41–43. Petitioner contends that Oh teaches the additional limitation of claim 6 because it discloses the video door phone includes functionality for identifying a visitor based on the visitor's voice and image, and therefore, is a "security monitoring system" and a "building entry system." Pet. 23–24 (citing Ex. 1004, 3:8–11, 4:62–66, 8:33–45, 16:26–30; Ex. 1017 ¶ 120); *see also id.* at 11–12.

Claim 7 depends from claim 1 and recites the further step of, "if the watcher is not available, performing at least one of the following: providing a notification associated with the alert to another watcher and executing a predetermined response action." Ex. 1001, 10:44–48. Petitioner contends that Oh teaches the additional limitation of claim 7 because it discloses that, if the resident is not available, the home gateway device executes a predetermined response action such as recording images and voices of the visitor for later use by the resident. Pet. 24 (citing Ex. 1004, 6:10–14, 6:22–26, 6:43–45, 8:45–48, 15:52–67, Fig. 7); *see also id.* at 16.

Claim 9 depends from claim 8 and further recites "wherein the instructions further comprise: selecting a client application and a client device to provide the notification and to present the plurality of actions to the user based on the current location of the user." Ex. 1001, 10:60–64. Petitioner contends that Oh teaches the additional limitation of claim 9 because it discloses that the home gateway determines that the resident is away from home and selects a visitor identifying and communicating terminal or the wireless communication terminal to provide the notification

IPR2021-01374
Patent 7,956,739 B2

to the resident and present the resident with options, such as allowing a connection for communicating with the visitor or pressing button to reproduce a recording of the visitor's video. Pet. 26–27 (citing Ex. 1004, 9:22–27, 12:24–40, 13:62–14:10, Figs. 5, 6; Pet. 20–21); *see also id.* at 14–16.

Claim 10 depends from claim 9 and further recites "wherein the user is a watcher and the client device is a personal presentity." Ex. 1001, 10:65–67. Petitioner contends that Oh teaches the additional limitation of claim 10 because it discloses that resident ("watcher") receives presence information and because its wireless communication terminal ("personal presentity") is used to determine the location of the resident and is, therefore, associated with the presence of the resident being either at home or away from home. Pet. 28 (citing Ex. 1004, 4:43–49, 5:1–4, 6:15–20, 6:27–34, 6:53–65, 8:26–40, 10:35–40, 12:13–16, 13:50–53, 16:17–20, Figs. 3–7).

Claim 11 depends from claim 10 and further recites "wherein the application includes at least one of: a voice communication through the personal presentity, a video communication through the personal presentity, an image acquisition application, and an electronic control application." Ex. 1001, 11:1–5. Petitioner contends that Oh teaches the additional limitation of claim 11 because it discloses that the home gateway device provides (a) video of the visitor captured by the video door phone to resident, (b) voice communication between the visitor and resident through the video door phone, (c) an image of the visitor to the resident, and (d) a reproduce button to control playback of a recording of the visitor's voice and image. Pet. 28–29 (citing Ex. 1004, 3:8–11; Ex. 1017 ¶ 150) (also

IPR2021-01374
Patent 7,956,739 B2

incorporating its contentions for claim 3); *see also id.* at 14–16. Petitioner further contends that it would have been obvious to modify Oh to allow the resident to "buzz" the visitor in, which Oh describes as prior art. *Id.* at 22 (citing Ex. 1004, 3:8–11; Ex. 1017 ¶ 150).

Patent Owner does not present separate argument for claims 3, 6, 7, and 9–11. *See generally* PO Resp. We have reviewed Petitioner's evidence and argument and based on the complete record, we find that Petitioner has shown by a preponderance of the evidence that Oh teaches each of the limitations of claims 3, 6, 7, and 9–11.

### 5. *Weighing the Graham Factors*

"Once all relevant facts are found, the ultimate legal determination [of obviousness] involves the weighing of the fact findings to conclude whether the claimed combination would have been obvious to an ordinary artisan." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1361 (Fed. Cir. 2017). On balance, considering the record before us, Petitioner has shown, by a preponderance of the evidence, that Oh would have rendered the subject matter of claims 1–3 and 6–11 obvious to one of ordinary skill in the art at the time of the invention.

### F. *Anticipation Based on Oh*

Petitioner also contends that claims 1–3 and 6–11 are anticipated by Oh. Pet. 3, 10–29. We do not reach this alleged ground of unpatentability of claims 1 and 10 because we determine that Petitioner has proved by a preponderance of the evidence that claims 1–3 and 6–11 would have been obvious over Oh. *Cf. In re Gleave*, 560 F.3d 1331, 1338 (Fed. Cir. 2009) (not reaching other grounds of unpatentability after affirming a ground based on anticipation); *see also Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1423

IPR2021-01374
Patent 7,956,739 B2

(Fed. Cir. 1984) (explaining that an administrative agency is at liberty to reach a decision based on a dispositive issue because doing so "can not only save the parties, the [agency], and [the reviewing] court unnecessary cost and effort," but "can greatly ease the burden on [an agency] commonly faced with a . . . proceeding involving numerous complex issues and required by statute to reach its conclusion within rigid time limits").

### G. Obviousness over Oh, Forbes, and TS23.141

Petitioner contends that claims 4, 5, and 12–17 are unpatentable under 35 U.S.C. § 103 as obvious over the combination of Oh, Forbes, and TS23.141. Pet. 29–57. For the reasons that follow, we are persuaded that Petitioner has shown by a preponderance of the evidence that claims 4, 5, 12–17 would have been obvious over the combination of Oh, Forbes, and TS23.141.

### 1. Independent Claim 12

#### a) "A system for providing distributed access services between a watcher and a personal presentity, comprising:"

Petitioner relies on its contentions for claim 1's preamble to argue that Oh discloses a system for providing distributed access services between a watcher and a personal presentity. Pet. 47. Petitioner contends that the resident in Oh is a "watcher" because the resident receives notifications indicating the presence of a visitor at the video door phone. *Id.* Petitioner further contends that the video door phone is a "personal presentity" because it had presence information for a person associated with it (i.e., a visitor at the video door phone). *Id.*

Patent Owner does not present arguments as to the preamble of claim 12. *See generally* PO Resp. Based on the entirety of the record and for the

52

IPR2021-01374
Patent 7,956,739 B2

reasons explained by Petitioner, we determine that Petitioner has proved by a preponderance of the evidence that Oh teaches the preamble of claim 12.

> b) *"an interface device configured to: detect a trigger event; and provide a notification associated with the trigger event, wherein the interface device acts as the personal presentity;"*

Petitioner contends Oh teaches these limitations because Oh discloses a video door phone, i.e., an interface device that detectes a visitor activating a doorbell button and sends a doorbell signal to the home gateway device indicating the bell activation event. Pet. 47 (citing Ex. 1004, 4:44–50, 6:15–18, 8:54–57, 10:27–33, 12:5–10, 15:36–39, Fig. 4–7). Petitioner further contends that Oh discloses that the video door phone has presence information for the visitor associated with activating the doorbell and, therefore, acts as a "personal presentity." *Id.* at 47–48 (citing Ex. 1004, 4:44–50, 6:15–18, 8:54–57, 10:27–33, 12:5–10, 15:36–39, Fig. 4–7); *see also id.* at 33–34.

Patent Owner does not present arguments as to this limitation. *See generally* PO Resp. Based on the entirety of the record and for the reasons explained by Petitioner, we determine that Petitioner has proved by a preponderance of the evidence that Oh teaches this limitation of claim 12.

> c) *"a presentity application configured cause the system to: determine a current location of the watcher;"*

Petitioner relies on its contentions for claim 1's substantively identical determining limitation to argue that Oh discloses determining a current location of the watcher, and that Oh discloses this functionality is performed by components of the home gateway device, which can be embodied as a program on a computer. Pet. 48 (citing Ex. 1004, 8:54–9:21, 16:1–9) (referring to Petitioner's contentions for claim 1); *see also id.* at 34.

Aside from its argument relating to "determin[ing] a current location," which we address above, Patent Owner does not present separate arguments as to this limitation. *See generally* PO Resp. Based on the entirety of the record and for the reasons explained by Petitioner, we determine that Petitioner has proved by a preponderance of the evidence that Oh teaches this limitation of claim 12.

> d) *"provide the current location of the watcher to an aggregate presence service; and"*

Petitioner contends that Forbes discloses a presence server that maintains the presence status of its PTT clients and publishes that information to other PTT clients. Pet. 48–49 (citing Ex. 1005, 2:44–51, 3:67–4:8, 5:18–24, 7:59–60, Figs. 1, 3, 4). Petitioner contends that TS23.141 similarly discloses a presence server for receiving and providing presence information as well as information regarding the watcher. *Id.* (citing Ex. 1006, 12–14, 21; Ex. 1017 ¶¶ 175–180); *see also id.* at 34–35 (citing Ex. 1005, 3:67–4:8, 5:18–28, Fig. 1, 3; Ex. 1006, 13–14, 21). Petitioner contends that "the presence server disclosed in Forbes, modified as in TS23.141 to receive watcher information" teaches the claimed "aggregate presence service." *Id.* at 35. In its Reply, Petitioner further contends that "[t]he presence service of TS23.141 expressly receives 'network provided location' information, which includes a device's '[l]ast known' position on a cellular network 'and/or geographic coordinates.'" Pet. Reply 21–22 (citing Ex. 1006, 21; Ex. 2001 ¶¶ 100–101; Ex. 1033, 111:2–112:10; Ex. 1032 ¶¶ 52–55).

Patent Owner, relying on its claim construction positions, argues that Oh does not teach "providing the current location," and that the combination

IPR2021-01374
Patent 7,956,739 B2

of Oh, Forbes, and TS 23.141 fails to teach an "aggregate presence service" that includes location information obtained from a location service. PO Resp. 37–38.

We do not adopt Patent Owner's proposed claim constructions for either term, and therefore, we find Patent Owner's arguments unpersuasive. As discussed above, under the proper construction, Oh discloses determining a current location. *See supra* §§ III.C.1.b., III.E.1.c. Similarly, we disagree with Patent Owner that an "aggregate presence service" requires location information obtained from a location service. *See supra* §§ III.C.2.b.

Based on the entirety of the record and for the reasons explained by Petitioner, we determine that Petitioner has proved by a preponderance of the evidence that Oh teaches this limitation of claim 12.

> e) *"in response to receiving a watcher selection from the aggregate presence service, facilitate execution of the selected action by activating at least one of a plurality of client applications associated with the personal presentity."*

Petitioner contends Oh teaches receiving a selection made by the resident from options such as allowing a connection for communicating with the visitor in real time or transmitting a recording of visitor's image and voice, and sending that selection to the home gateway device as well as executing the resident's selected action on the resident's terminal. Pet. 49–51 (citing Ex. 1004, 4:62–5:17, 5:38–42, 5:64–6:2, 6:10–14, 6:20–26, 6:43–45, 7:18–19, 8:37–40, 8:54–9:21, 11:1–7, 11:18–49, 12:41–13:20, 14:11–19, 14:31–64, 16:1–9, Figs. 4–6). Petitioner contends that Forbes and TS23.141 both disclose a presence server that receives and publishes information regarding the availability and location of users, and that it would have been obvious to an ordinarily skilled artisan to modify Oh such that the home

IPR2021-01374
Patent 7,956,739 B2

gateway device receives watcher information, which could have included a watcher selection, from the presence server. *Id.* at 50–51 (citing Ex. 1005, 3:67–4:8, 5:18–24, Fig. 4; Ex. 1017 ¶¶ 181–185); *see also id.* at 36–37 (citing Ex. 1005, 3:67–4:8, 5:18–20; Ex. 1006, 13–14; Ex. 1017 ¶¶ 181–185).

Patent Owner does not present separate arguments as to this limitation. *See generally* PO Resp. Based on the entirety of the record and for the reasons explained by Petitioner, we determine that Petitioner has proved by a preponderance of the evidence that the combination of Oh, Forbes, and TS23.141 teaches this limitation of claim 12.

   *f)  Motivation to Combine Oh with Forbes and TS23.141*

Petitioner contends that an ordinarily skilled artisan would have been motivated to combine the teachings of Oh with Forbes and TS23.141. Pet. 40–43. Petitioner contends that a person of ordinary skill in the art would have considered the teachings of one reference applicable to the other two given the similarities between the three references, such as providing notifications indicating the presence of a person, providing images of the person, and facilitating IP-based voice communication with the person. *Id.* at 40–41 (citing Ex. 1004, 5:18–45, 11:32–49; Ex. 1005, 1:33–39, 1:50–66, 5:18–39; Ex. 1006, 13, 20, 27–30). Petitioner further contends that all three references disclose the use of 3G cellular networks as well as the use of SIP as a preferred communication protocol, and Oh and Forbes teach the use of RTP for transmitting voice data packets. *Id.* at 41 (citing Ex. 1004, 1:29–37, 4:16–24, 6:45–53, 8:16–48, 9:22–26, 10:27–11:65; Ex. 1005, 2:54–58, 3:2–7, 3:64–65, 4:37–53; Ex. 1006, 8, 13, 19–24). Petitioner argues that a person of ordinary skill in the art "would naturally look to incorporate

IPR2021-01374
Patent 7,956,739 B2

features of the Forbes system and TS23.141 into the system disclosed by Oh." *Id.* (citing Ex. 1017 ¶¶ 217–220.)

Petitioner contends that both Forbes and TS23.141 use the IMS infrastructure, [13] and a person of ordinary skill in the art would have looked to incorporate those features into Oh's system because that would have provided the benefits of facilitating communications via the well-known IMS infrastructure and utilizing a "presence server" to manage presence information for the system. *Id.* at 41–42 (citing Ex. 1004, 16:29–30; Ex. 1017 ¶¶ 217–220). According to Petitioner, communication of presence information as well as voice and other data via the IMS infrastructure, as disclosed in Forbes and TS23.141, would have resulted in the expected benefit of providing access independent, IP-based multimedia services, which allowed the system to communicate with any number of IP-based terminal devices and applications, including push-to-talk cellular, VoIP, video streaming, email, and instant messaging. *Id.* at 42 (citing Ex. 1005, 3:2–7; Ex. 1017 ¶ 221). Petitioner further contends that a skilled artisan would have recognized that, similar to Oh, the "presence server" disclosed in Forbes and TS23.141 could have managed presence information regarding the location of a resident, and "would have recognized the expected benefit of using a presence server to manage presence information from multiple monitored properties." *Id.* at 42–43 (citing Ex. 1017 ¶ 222).

---

[13] Petitioner asserts that 3GPP, a collaboration among telecommunications standards organizations for standards pertaining to 3G wireless networks, developed IMS in 2001 to provide a standard, IP-based architecture to implement multimedia services, such as Voice of IP ("VoIP") on 3G wireless networks. Pet. 30 (citing Ex. 1017 ¶¶ 47–52).

IPR2021-01374
Patent 7,956,739 B2

Petitioner argues that implementing the teachings of Forbes and
TS23.141 in Oh's system would have been technically straightforward for an
ordinarily skilled artisan because all three references disclose IP-based
systems and use the same communications protocols. Pet. 43 (citing
Ex. 1005, 4:34–36; Ex. 1005, 3:2–7; Ex. 1006, 8–24; Ex. 1017 ¶ 223).

### (1) Patent Owner's Response

Patent Owner responds that Petitioner's reasons to combine the
teachings of Oh with Forbes and TS23.141 are "are legally deficient [and]
factually incorrect." *See* PO Resp. 38–40. Patent Owner argues that the
alleged similarities among Oh, Forbes, and TS 23.141 cannot provide a
motivation to combine and that Mr. Rysavy's testimony overstates the
alleged similarities. *Id.* at 39 citing (Ex. 1017 ¶¶ 179–180, 217–220).
Patent Owner argues that Mr. Rysavy testifies that Oh, Forbes, and
TS 23.141 "all operate on 3G cellular networks and thus were based on the
same networking technology," but he provides no evidentiary support for
this statement. *Id.* (citing Ex. 1017 ¶ 218). Oh, Patent Owner argues,
"specifically differentiates itself from any specific type of network
technology, much less a 3G," and "distinguishes itself from prior art that
was dependent on heterogenous network protocols." *Id.* at 39–40 (citing
Ex. 1004, 3:18–24; Ex. 2001 ¶ 211). Patent Owner further argues that
Petitioner and Mr. Rysavy fail to provide a "rationale for why, or how, a
[person of ordinary skill in the art] would have modified Oh to add the
presence server of Forbes and TS 23.141." *Id.* at 40 (citing Ex. 1017 ¶ 221;
Ex. 2001 ¶ 212).

Patent Owner also argues that there is no evidence as to the ease with
which a person of ordinary skill in the art could have added IMS to Oh, nor

IPR2021-01374
Patent 7,956,739 B2

is there any evidence as to why such person would do so. PO Resp. 46
(citing Ex. 1017 ¶¶ 156, 202, 210). Patent Owner contends that "[t]he
primary benefit of using IMS would have been the advantages of an all-IP
system, but Oh was already an all-IP system," and that Petitioner "identifies
no shortcoming in Oh that would have caused a POSITA to look to IMS."
*Id.* (citing Ex. 2001 ¶ 223).

### (2) Petitioner's Reply

Petitioner responds that Patent Owner's arguments "ignore[] Mr.
Rysavy's detailed explanation that the addition of a presence server would
have enabled the Oh system to '***conveniently support multiple subscribers***'
and 'manage presence information ***from multiple monitored properties***.'"
Pet. Reply 22 (citing Ex. 1017 ¶¶ 221–222). Petitioner contends that Oh
specifically contemplates that a user might have multiple "properties." *Id.*
(citing Ex. 1004, 16:29–30; Ex. 1032 ¶ 70). Petitioner further argues that
Patent Owner is incorrect about Oh differentiating itself from specific types
of network technology because "Oh specifically identifies CDMA2000 as a
3G network on which it was designed to operate." *Id.* at 22–23 (citing
Ex. 1004, 4:19–22, 6:47–52; Ex. 1017 ¶¶ 44, 218; Ex. 1032 ¶¶ 71–72).

As to adding IMS to Oh's system, Petitioner contends that
Mr. Rysavy "explained the rationale at length—including that IMS would
facilitate the interoperability of the Oh system and its multiple types of
terminal devices—and explained how networking commonalities made this
combination 'technically straightforward.'" Pet. Reply 26 (citing Ex. 1017
¶¶ 48, 202–203, 223). Petitioner argues IMS is IP-based and "improves on
existing IP technology by facilitating the interoperability of multimedia
services for devices operating on different types of networks (including

IPR2021-01374
Patent 7,956,739 B2

IP-based networks), like those disclosed in Oh." *Id.* (citing Ex. 1001, 6:12–19; Ex. 1032 ¶¶ 73–76).

### (3) Our Analysis

On the complete record, Petitioner has shown by a preponderance of the evidence that an ordinarily skilled artisan would have had sufficient reasons to combine the teachings of Oh with those of Forbes and TS23.141, in the manner proposed by Petitioner, with a reasonable expectation of success. *See* Pet. 40–43; Pet. Reply 22–23, 26; Ex. 1017 ¶¶ 217–224; Ex. 1032 ¶¶ 69–76.

Petitioner explains that implementing the teachings of Forbes and TS23.141 in Oh's system would have resulted in the benefits of using the IMS infrastructure as well as utilizing a "presence server" to manage presence information from monitoring systems installed in any number of properties. Pet. 41–42. Mr. Rysavy testifies:

> Communication of presence information and voice and other data via the IMS infrastructure, as disclosed in Forbes and TS23.141, would have provided the expected benefit of providing "access independent, IP-based multi-media services," which allowed the system to communicate with any number of IP-based terminal devices and applications, including push-to-talk cellular, VoIP, video streaming, email and instant messaging.

Ex. 1017 ¶ 221. He further testifies that a person of ordinary skill in the art would have recognized that IMS's "access independent" infrastructure would have facilitated the interconnection of devices such as PDAs, web-pads, and PCs disclosed in Oh. *Id.* He also testifies that an ordinarily skilled artisan would have recognized that Oh's system could benefit from the "presence server" disclosed in Forbes and TS23.141 to manage presence

information from multiple monitored properties. *Id.* ¶ 222; *see also*
Ex. 1032 ¶¶ 71–72 (explaining how the proposed combination would work).
Mr. Rysavy's testimony persuasively demonstrates that an ordinarily skilled
artisan would have been motivated to apply the teachings of Forbes and
TS23.141 to Oh's system.

We disagree with Patent Owner that "Oh specifically differentiates
itself from any specific type of network technology, much less a 3G [one]."
PO Resp. 39–40. Oh discloses that "the wireless communication terminal
must be capable of packet network based high-speed data communication,"
and specifically identifies "CDMA-2000 1x EV-DO/EV-DV or IMT-2000
[a]s a next generation mobile communication service providing an
IP mobility of a terminal." *See* Ex. 1004, 4:16–22. Mr. Rysavy testifies that
CDMA2000 refers to a 3G network and that "the PDSN technology
described in Oh was specific to the CDMA2000 3G network." *See* Ex. 1032
¶ 72. We therefore find Mr. Rysavy's testimony that Oh, Forbes, and
TS23.141 all operate on 3G cellular networks to be based on the express
disclosure in those references.[14]

Next, Patent Owner's argument that Petitioner's proposed
combination of IMS with Oh fails because Oh itself was *already* an all-IP
system ignores that Petitioner relies on the benefits that IMS brings to an
IP-based system, i.e., benefits that are not disclosed in Oh. Mr. Rysavy
testifies that "IMS provides important interoperability advantages to

---

[14] Contrary to Patent Owner's assertion (PO Resp. 40), the prior art that Oh distinguishes itself from is one that uses telephone numbers and call signaling, not 3G networks that support IP mobility. Ex. 1004, 3:4–25, 4:16–22.

IPR2021-01374
Patent 7,956,739 B2

IP-based systems, including allowing them to (for example) interface with various access technologies." Ex. 1032 ¶ 76 (citing Ex 1008, 14). We credit Mr. Rysavy's testimony because it is consistent with the cited evidence, including the '739 patent itself, which states that

> IMS also provides *access to IP based services independent of the underlying access technology (mobile or fixed)*. IMS applications and drivers may include voice telephony (VoIP), video telephony, web browsing, presence-based services, push-to media services (e.g. push-to-talk, push-to-view, push-to-video, etc.), group chat, instant messaging, multimedia conferencing, content sharing/data transfer, and the like.

Ex. 1001, 6:12–19 (emphasis added); Ex. 1032 ¶ 76. Patent Owner's argument therefore ignores the benefits of using IMS in an all-IP system (like Oh's) that the '739 patent itself acknowledges.

As to Patent Owner's arguments relating to a reasonable expectation of success (PO Resp. 40, 46), Mr. Rysavy testifies that IMS uses SIP signaling as well as RTP to transmit voice data via IP, and "implementing the Oh system using the IMS infrastructure would merely have required adapting Oh's existing communications protocols to use the IMS infrastructure." Ex. 1017 ¶ 223 (citing Ex. 1005, 3:2–7, 4:34–36; Ex. 1006, 8–24); Pet. 43. We credit Mr. Rysavy's testimony because it is supported by the cited evidence. To the extent Patent Owner's argument is directed at physically combining a presence server or IMS into Oh's system, Petitioner is not required to make such a showing as part of its obviousness ground. *See In re Mouttet*, 686 F.3d at 1332.

For the reasons discussed above, Petitioner has shown, by a preponderance of the evidence, sufficient reasons why one of ordinary skill in the art would have combined Forbes, and TS 23.141 teachings with Oh's

system in the manner asserted by Petitioner, with a reasonable expectation of success.

### g) Conclusion as to Claim 12

We have reviewed the parties' evidence and argument, and based on the complete record, we find that Petitioner has shown by a preponderance of the evidence that Oh teaches each of the limitations of claim 12.

### 2. Dependent Claims 4, 5, and 13–17

Petitioner argues that dependent claims 4 and 5 (depending from claim 1) and 13–17 (depending from claim 12) would have been obvious over the combination of Oh, Forbes, and TS23.141. Pet. 44–57. Petitioner provides analysis detailing where it contends each of the limitations of dependent claims 4, 5, and 13–17 are taught by the combination of Oh, Forbes, and TS23.141. *Id.*

Claim 4 depends from claim 3 and further recites "providing the notification and receiving the watcher selection through at least one Session Initiation Protocol (SIP) session using an IP Multi Media System (IMS) infrastructure." Ex. 1001, 10:34–38. Petitioner contends that the combination of Oh, Forbes, and TS23.141 teaches the additional limitation of claim 4 because Oh discloses providing a notification of a bell activation event to the resident and receiving the resident's selection via SIP sessions, and both Forbes and TS23.141 disclose using SIP sessions in an IMS infrastructure. Pet. 44–45 (citing Ex. 1004, 4:44–49, 6:15–20, 6:34–39, 6:60–65, 7:14–18, 8:33–45, 11:1–17, 12:41–53, 14:11–19, Figs. 4–6; Ex. 1005, 2:50–54, 3:15–17, 3:41–43, 3:64–65, 4:22–36, Figs. 1, 2; Ex. 1006, 13, 32; Ex. 1017 ¶¶ 152–157); *see also id.* at 31–32.

IPR2021-01374
Patent 7,956,739 B2

Claim 5 depends from claim 3 and further recites "wherein the voice communication is established employing a Voice over IP (VoIP) network." Ex. 1001, 10:39–40. Petitioner contends that the combination of Oh, Forbes, and TS23.141 teaches the additional limitation of claim 5 because Oh discloses voice communication between the resident and visitor via IP using RTP packets to transmit voice data, and Forbes discloses VoIP communication via RTP. Pet 46–47 (citing Ex. 1004, 6:20–22, 7:11–19, 8:16–25, 11:36–49, 13:5–20, 14:50–64, 16:10–13, Fig. 1; Ex. 1005, 3:2–5, 4:50–51, 5:38–39; Ex. 1017 ¶¶ 158–162); *see also id.* at 32–33 (arguing that, "to the extent Oh did not expressly disclose the use of VoIP for voice communications, a [person of ordinary skill in the art] would have understood from the disclosure in Forbes that the RTP-based communications disclosed in Oh referred to VoIP").

Claim 13 depends from claim 12 and further recites "wherein the presentity application is a doorbell presence application and the personal presentity is a doorbell presence hardware." Ex. 1001, 11:21–23. Petitioner contends that the combination of Oh, Forbes, and TS23.141 teaches the additional limitation of claim 13 because Oh discloses that its video door phone is a physical doorbell device, including a bell button, camera, microphone, and speaker. Pet. 51–52 (citing Ex. 1004, 4:44–50, 6:15–18, 8:54–57, 10:27–33, 12:5–10, 15:36–39, 16:1–9, Figs. 4–7) *see also id.* at 33–34.

Claim 14 depends from claim 13 and further recites

> wherein the doorbell presence application is further configured to cause the system to perform at least the following:
> manage at least one from a set of: a VoIP call between the watcher and a person using the doorbell presence hardware, a

IPR2021-01374
Patent 7,956,739 B2

> capture of a still image of the person, a capture of a video of the person, and a control mechanism activation by activating one of the plurality of client applications associated with the doorbell presence hardware.

Ex. 1001, 11:24–12:6. Petitioner contends that the combination of Oh, Forbes, and TS23.141 teaches the additional limitation of claim 14 because Oh discloses that the home gateway device includes functionality to provide (i) voice communication between the resident and visitor via VoIP and RTP, (ii) a "still image" of the visitor to the resident, (iii) video of the visitor, and (iv) a video reproduce button. Pet. 52–54 (citing Ex. 1004, 1:18–49, 5:38–42, 5:64–6:2, 6:10–14, 6:20–22, 6:22–26, 6:43–45, 7:18–19, 8:45–48, 9:12–19, 12:41–13:20, 14:31–64, 15:52–67, Figs. 4–7). Petitioner contends that it would have been obvious to modify Oh to allow the resident to buzz the visitor in. *Id.* (citing Ex. 1004, 3:8–11; Ex. 1017 ¶ 192). Petitioner contends that Forbes similarly discloses VoIP support and discloses RTP packets used to transmit voice data, and that it would have been obvious to capture still images from video. *Id.* (citing Ex. 1017 ¶ 196); *see also id.* at 37–39.

Claim 15 depends from claim 13 and further recites "wherein the doorbell presence application is configured to cause the system to communicate with the aggregate presence service and the plurality of client applications through one or more SIP sessions using the IMS infrastructure. Ex. 1001, 12:7–11. Petitioner contends that the combination of Oh, Forbes, and TS23.141 teaches the additional limitation of claim 15 because Oh discloses using SIP sessions to communicate with the visitor, and both Forbes and TS23.141 disclose that PTT clients communicate with the presence server via SIP sessions using the IMS infrastructure. Pet. 54–55

65

IPR2021-01374
Patent 7,956,739 B2

(citing Ex. 1004, 6:34–39, 7:14–18, 11:1–17, 12:41–53, 14:11–19, Figs. 4–6; Ex. 1005, 2:50–54, 3:15–17, 3:41–43, 3:64–65, 5:18–28, Figs. 1, 2; Ex. 1006, 13; Ex. 1017 ¶¶ 197–205); *see also id.* at 34–37.

Claim 16 depends from claim 13 and further recites "wherein the doorbell presence application is further configured to cause the system to register and update a profile associated with the doorbell presence hardware in a home subscriber service component of the IMS infrastructure." Ex. 1001, 12:12–16. Petitioner contends that the combination of Oh, Forbes, and TS23.141 teaches the additional limitation of claim 16 because Oh discloses that its home gateway device receives presence information from the video door phone, and both Forbes and TS23.141 disclose the use of a Home Subscriber Server ("HSS") in the IMS infrastructure to store and provide presence information, e.g., as a profile. Pet. 55–56 (citing Ex. 1004, 4:44–50, 6:15–18, 8:54–57, 10:27–33, 12:5–10, 15:36–39, 16:1–9, Figs. 4–7; Ex. 1005, 3:10–15, 3:24–26, Fig. 2; Ex. 1006, 7, 9, 10, 13, 16, 17, 25–30). Petitioner contends that it would have been obvious to one of ordinary skill in the art to modify the home gateway device to register and update a profile on the HSS disclosed in Forbes in TS23.141. *Id.* (citing Ex. 1017 ¶¶ 206–211); *see also id.* at 39–40.

Claim 17 depends from claim 12 and further recites "wherein the personal presentity is a monitoring device configured to capture an image of a monitored location in response to a selection by the watcher, and wherein the presentity application is a monitoring presence application configured to manage notification of the watcher and delivery of the captured image to the watcher." Ex. 1001, 12:17–22. Petitioner contends that the combination of Oh, Forbes, and TS23.141 teaches the additional limitation of claim 17

IPR2021-01374
Patent 7,956,739 B2

because Oh discloses that the video door phone contains a camera that captures video of the location and that the home gateway device includes functionality that monitors inputs from the video door phone, provides notifications to the resident when the doorbell button is pressed, and delivers a captured image of the visitor to the resident's terminal. Pet. 56–57 (citing Ex. 1004, 4:44–49, 5:57–60, 6:15–20, 6:60–65, 8:26–42, 11:18–21, 12:54–57, 14:31–34, Figs. 4–6); *see also id.* at 37–39.

Patent Owner does not present separate argument for claims 4, 5, and 13–17. *See generally* PO Resp. We have reviewed Petitioner's evidence and arguments, and based on the complete record, we find that Petitioner has shown by a preponderance of the evidence that the combination of Oh, Forbes, and TS23.141 teaches each of the limitations of claims 4, 5, and 13–17.

3. *Weighing the Graham Factors*

"Once all relevant facts are found, the ultimate legal determination [of obviousness] involves the weighing of the fact findings to conclude whether the claimed combination would have been obvious to an ordinary artisan." *Arctic Cat*, 876 F.3d at 1361. On balance, considering the record before us, Petitioner has shown, by a preponderance of the evidence, that the combination of Oh, Forbes, and TS23.141 would have rendered the subject matter of claims 4, 5, and 12–17 obvious to one of ordinary skill in the art at the time of the invention.

IPR2021-01374
Patent 7,956,739 B2

## IV. CONCLUSION

For the reasons discussed above, Petitioner has demonstrated, by a preponderance of the evidence, that claims 1–17 of the '739 patent are unpatentable.[15]  Our conclusions regarding the challenged claims are summarized below:

| Claims Challenged | 35 U.S.C. § | Reference(s) /Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–3, 6–11 | 103(a) | Oh | 1–3, 6–11 | |
| 1–3, 6–11 | 102[16] | Oh | | |
| 4, 5, 12–17 | 103(a) | Oh, Forbes, TS23.141 | 4, 5, 12–17 | |
| **Overall Outcome** | | | **1–17** | |

---

[15] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).
[16] As explained above, given our disposition of the obviousness ground based on Oh, we do not reach Petitioner's alternative anticipation ground based on Oh.

IPR2021-01374
Patent 7,956,739 B2

## V.  ORDER

It is therefore,

ORDERED that claims 1–17 of U.S. Patent No. 7,956,739 B2 are determined to be unpatentable; and

FURTHER ORDERED that, because this a Final Written Decision, parties to this proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2021-01374
Patent 7,956,739 B2

FOR PETITIONER:

William H. Mandir
David P. Emery
SUGHRUE MION, PLLC
wmandir@sughrue.com
demery@sughrue.com

Sharonmoyee Goswami
Matthew J. Boggess
Mmarc J. Khadpe
CRAVATH, SWAINE & MOORE LLP
sgoswami@cravath.com
mboggess@cravath.com
mkhadpe@cravath.com

FOR PATENT OWNER:

R. Parrish Freeman
Eric L. Maschoff
MASCHOFF BRENNAN PLLC
pfreeman@mabr.com
emaschoff@mabr.com

70



US007956739B2

(12) **United States Patent**
Hong et al.

(10) **Patent No.:**      **US 7,956,739 B2**
(45) **Date of Patent:**       \*Jun. 7, 2011

(54) **MONITORING AND ENTRY SYSTEM PRESENCE SERVICE**

(75) Inventors: **Nguyen Thi Hong**, Atlanta, GA (US); **Denny Sean Michael**, Sharpsburg, GA (US)

(73) Assignee: **AT&T Intellectual Property I, L.P.**, Reno, NV (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/483,306**

(22) Filed: **Jun. 12, 2009**

(65) **Prior Publication Data**

US 2009/0267754 A1    Oct. 29, 2009

**Related U.S. Application Data**

(63) Continuation of application No. 11/520,262, filed on Sep. 13, 2006, now Pat. No. 7,561,041.

(51) **Int. Cl.**
*G08B 21/00*      (2006.01)

(52) **U.S. Cl.** ......................... **340/540**; 340/541; 340/565

(58) **Field of Classification Search** .................. 340/540, 340/541, 825.49, 7.46, 7.56, 573.1, 539.1, 340/468, 550, 551, 565; 379/167.05; 455/412.2
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,675,733 A | 10/1997 | Williams | |
| 5,720,771 A | 2/1998 | Snell | |
| 5,793,365 A | 8/1998 | Tang et al. | |
| 5,796,393 A | 8/1998 | MacNaughton et al. | |
| 5,812,639 A | 9/1998 | Bartholomew et al. | |
| 5,926,179 A | 7/1999 | Matsuda et al. | |
| 6,047,327 A | 4/2000 | Tso et al. | |
| 6,058,420 A | 5/2000 | Davies | |
| 6,108,709 A | 8/2000 | Shinomura et al. | |
| 6,151,507 A | 11/2000 | Laiho et al. | |
| 6,219,045 B1 | 4/2001 | Leahy et al. | |
| 6,286,033 B1 | 9/2001 | Kishinsky et al. | |
| 6,301,609 B1 | 10/2001 | Aravamudan et al. | |
| 6,425,006 B1 | 7/2002 | Chari et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

WO      WO 03/098449      11/2003

(Continued)

OTHER PUBLICATIONS

Nguyen; Final Office Action mailed Jul. 16, 2010 for U.S. Appl. No. 11/525,008, filed Sep. 21, 2006.

(Continued)

*Primary Examiner* — Toan N Pham
(74) *Attorney, Agent, or Firm* — Thomas, Kayden, Horstemeyer & Riley, LLP

(57)      **ABSTRACT**

A monitoring and entry system presence service provides notification about a trigger event to a user and performs actions based on user input. Interface devices equipped with client applications capable of performing actions such as VoIP calls, video calls, and the like, register with a control and session layer, which facilitates interaction with a specific presence application and an integrated presence service, such as a doorbell application and a generic presence service. Upon determining the location of a user, notification and a list of actions are provided through a watcher client application. In response to the user selection, actions are facilitated through the same network session(s).

**17 Claims, 9 Drawing Sheets**



MONITORING AND ENTRY
SYSTEM PRESENCE SERVICE
ARCHITECTURE

Petitioner ADT Exhibit 1001
1001.001

**US 7,956,739 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,429,893 | B1 | 8/2002 | Xin |
| 6,466,261 | B1 | 10/2002 | Nakamura |
| 6,546,005 | B1 | 4/2003 | Berkley et al. |
| 6,553,416 | B1 | 4/2003 | Chari et al. |
| 6,584,494 | B1 | 6/2003 | Manabe et al. |
| 6,591,094 | B1 | 7/2003 | Bentley |
| 6,654,790 | B2 | 11/2003 | Ogle et al. |
| 6,658,095 | B1 | 12/2003 | Yoakum et al. |
| 6,665,375 | B1 | 12/2003 | Forlenza et al. |
| 6,668,169 | B2 | 12/2003 | Burgan et al. |
| 6,671,693 | B1 | 12/2003 | Marpe et al. |
| 6,727,811 | B1 | 4/2004 | Fendis |
| 6,731,308 | B1 | 5/2004 | Tang et al. |
| 6,757,365 | B1 | 6/2004 | Bogard |
| 6,757,722 | B2 | 6/2004 | Lonnfors et al. |
| 6,771,173 | B1 | 8/2004 | Clayton et al. |
| 6,816,578 | B1 | 11/2004 | Kredo et al. |
| 6,879,677 | B2 | 4/2005 | Trandal et al. |
| 6,944,555 | B2 | 9/2005 | Blackett et al. |
| 6,954,136 | B2 | 10/2005 | Sauer |
| 6,965,935 | B2 | 11/2005 | Diong |
| 6,968,052 | B2 | 11/2005 | Wullert, II |
| 6,968,179 | B1 | 11/2005 | De Vries |
| 6,987,840 | B1 | 1/2006 | Bosik et al. |
| 6,993,327 | B2 | 1/2006 | Mathis |
| 7,015,806 | B2 | 3/2006 | Naidoo et al. |
| 7,020,696 | B1 | 3/2006 | Perry et al. |
| 7,043,530 | B2 | 5/2006 | Isaacs et al. |
| 7,058,036 | B1 | 6/2006 | Yu et al. |
| 7,262,690 | B2 | 8/2007 | Heaton et al. |
| 7,302,270 | B1 | 11/2007 | Day |
| 7,313,617 | B2 | 12/2007 | Malik et al. |
| 7,321,971 | B1 | 1/2008 | Malik |
| 7,324,826 | B1 | 1/2008 | Carey et al. |
| 7,353,455 | B2 | 4/2008 | Malik |
| 7,370,278 | B2 | 5/2008 | Malik et al. |
| 7,392,306 | B1 | 6/2008 | Donner et al. |
| 7,395,329 | B1 | 7/2008 | Holt et al. |
| 7,401,158 | B2 | 7/2008 | Beauchamp et al. |
| 7,406,501 | B2 | 7/2008 | Szeto et al. |
| 7,472,187 | B2 | 12/2008 | Malik |
| 7,483,969 | B2 | 1/2009 | Chavda et al. |
| 7,561,041 | B2 * | 7/2009 | Nguyen et al. ................ 340/540 |
| 7,624,172 | B1 | 11/2009 | Austin-Lane |
| 7,676,550 | B1 | 3/2010 | Jachner |
| 7,701,925 | B1 | 4/2010 | Mason et al. |
| 2002/0026483 | A1 | 2/2002 | Isaacs et al. |
| 2002/0032740 | A1 | 3/2002 | Stern et al. |
| 2002/0035605 | A1 | 3/2002 | McDowell et al. |
| 2002/0046299 | A1 | 4/2002 | Lefeber et al. |
| 2002/0160757 | A1 | 10/2002 | Shavit et al. |
| 2003/0018903 | A1 | 1/2003 | Greca et al. |
| 2003/0050986 | A1 | 3/2003 | Matthews et al. |
| 2003/0217098 | A1 | 11/2003 | Bobde et al. |
| 2003/0218631 | A1 | 11/2003 | Malik |
| 2004/0003046 | A1 | 1/2004 | Grabelsky et al. |
| 2004/0044738 | A1 | 3/2004 | Ohno et al. |
| 2004/0085203 | A1 | 5/2004 | Yeh |
| 2004/0086093 | A1 | 5/2004 | Schranz |
| 2004/0153506 | A1 | 8/2004 | Ito et al. |
| 2004/0171396 | A1 | 9/2004 | Carey et al. |
| 2004/0177118 | A1 | 9/2004 | Mason et al. |
| 2004/0177134 | A1 | 9/2004 | Lonnfors et al. |
| 2004/0179038 | A1 | 9/2004 | Blattner et al. |
| 2004/0179039 | A1 | 9/2004 | Blattner et al. |
| 2004/0221224 | A1 | 11/2004 | Blattner et al. |
| 2004/0267887 | A1 | 12/2004 | Berger et al. |
| 2005/0010644 | A1 | 1/2005 | Brown et al. |
| 2005/0068167 | A1 | 3/2005 | Boyer et al. |
| 2005/0166154 | A1 | 7/2005 | Wilson et al. |
| 2005/0210104 | A1 | 9/2005 | Torvinen |
| 2005/0216565 | A1 | 9/2005 | Ito et al. |
| 2005/0218206 | A1 | 10/2005 | Ohno et al. |
| 2005/0228895 | A1 | 10/2005 | Karrunanmurthy et al. |
| 2006/0004924 | A1 | 1/2006 | Trossen |
| 2006/0030264 | A1 | 2/2006 | Morris |
| 2006/0031772 | A1 | 2/2006 | Valeski |
| 2006/0167998 | A1 | 7/2006 | Yoshiuchi et al. |

| | | | |
|---|---|---|---|
| 2006/0242238 | A1 | 10/2006 | Issa |
| 2006/0248184 | A1 | 11/2006 | We et al. |
| 2006/0252444 | A1 | 11/2006 | Ozugur |
| 2006/0253593 | A1 | 11/2006 | Jachner |
| 2006/0277296 | A1 | 12/2006 | Matsubara et al. |
| 2007/0016649 | A1 | 1/2007 | Nishiki |
| 2007/0083627 | A1 | 4/2007 | Mohammed et al. |
| 2007/0121867 | A1 | 5/2007 | Ozugur et al. |
| 2007/0124469 | A1 | 5/2007 | Mohammed et al. |
| 2007/0136475 | A1 | 6/2007 | Leppisaari et al. |
| 2007/0150825 | A1 | 6/2007 | Jachner |
| 2007/0182541 | A1 | 8/2007 | Harris et al. |
| 2007/0198725 | A1 | 8/2007 | Morris |
| 2007/0208702 | A1 | 9/2007 | Morris |
| 2007/0233854 | A1 | 10/2007 | Bukovec et al. |
| 2007/0265859 | A1 | 11/2007 | Jachner |
| 2008/0052384 | A1 | 2/2008 | Marl et al. |
| 2008/0077685 | A1 | 3/2008 | Nguyen et al. |
| 2008/0184136 | A1 | 7/2008 | Malik |
| 2008/0209347 | A1 | 8/2008 | Malik et al. |
| 2008/0244026 | A1 | 10/2008 | Holt et al. |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 03/100637 | 12/2003 |

### OTHER PUBLICATIONS

Nguyen; Non-Final Rejection Dec. 31, 2009 for U.S. Appl. No. 11/524,668, filed Sep. 21, 2006.

Nguyen; Non-Final Rejection mailed Jan. 22, 2010 for U.S. Appl. No. 11/525,008, filed Sep. 21, 2006.

Malik; Non-Final Office Action mailed Apr. 8, 2010 for U.S. Appl. No. 12/059,320, filed Mar. 31, 2008.

Nguyen; Final Office Action mailed Jun. 8, 2010 for U.S. Appl. No. 11/524,668 mailed Sep. 21, 2006.

Holt; Final Rejection mailed Feb. 27, 2006 for U.S. Appl. No. 10/144,425, filed May 13, 2002.

Holt; Final Rejection mailed Jun. 19, 2007 for U.S. Appl. No. 10/144,425, filed May 13, 2002.

Holt; Non-Final Rejection mailed Jan. 3, 2007 for U.S. Appl. No. 10/144,425, filed May 13, 2002.

Holt; Non-Final Rejection mailed Jul. 14, 2006 for U.S. Appl. No. 10/144,425, filed May 13, 2002.

Holt; Non-Final Rejection mailed Aug. 25, 2005 for U.S. Appl. No. 10/144,425, filed May 13, 2002.

Holt; Notice of allowance and Fees Due mailed Jan. 28, 2008 for U.S. Appl. No. 10/144,425, filed May 13, 2002.

Holt; U.S. Appl. No. 10/144,425, filed May 13, 2002.

Holt; U.S. Appl. No. 12/133,590, filed Jun. 5, 2008.

Malik; Advisory Action mailed Jun. 11, 2004 for U.S. Appl. No. 10/223,859, filed Aug. 19, 2002.

Malik; Examiner Interview Summary mailed Apr. 21, 2004 for U.S. Appl. No. 10/223,859, filed Aug. 19, 2002.

Malik; Examiner Interview Summary mailed Nov. 14, 2003 for U.S. Appl. No. 10/223,859, filed Aug. 19, 2002.

Malik; Final Rejection mailed Feb. 24, 2004 for U.S. Appl. No. 10/223,859, filed Aug. 19, 2002.

Malik; Final Rejection mailed Sep. 7, 2006 for U.S. Appl. No. 10/223,859, filed Aug. 19, 2002.

Malik; Final Rejection mailed Nov. 21, 2005 for U.S. Appl. No. 10/223,859, filed Aug. 19, 2002.

Malik; Non-Final Rejection mailed Mar. 13, 2006 for U.S. Appl. No. 10/223,859, filed Aug. 19, 2002.

Malik; Non-Final Rejection mailed May 18, 2005 for U.S. Appl. No. 10/223,859, filed Aug. 19, 2002.

Malik; Non-Final Rejection mailed Jun. 6, 2007 for U.S. Appl. No. 10/223,859, filed Aug. 19, 2002.

Malik; Non-Final Rejection mailed Sep. 2, 2003 for U.S. Appl. No. 10/223,859, filed Aug. 19, 2002.

Malik; Non-Final Rejection mailed Oct. 20, 2004 for U.S. Appl. No. 10/223,859, filed Aug. 19, 2002.

Malik; Notice of Allowance and Fees Due mailed Dec. 5, 2007 for U.S. Appl. No. 10/223,859, filed Aug. 19, 2002.

Malik; Pre-Brief Appeal Conference Decision mailed Mar. 15, 2007 for U.S. Appl. No. 10/223,859, filed Aug. 19, 2002.

Petitioner ADT Exhibit 1001
1001.002

US 7,956,739 B2

Page 3

Malik; U.S. Appl. No. 10/223,859, filed Aug. 19, 2002.
Malik; U.S. Appl. No. 12/059,320, filed Mar. 31, 2008.
Mailk; Final Rejection mailed Dec. 5, 2006 for U.S. Appl. No. 10/985,361, filed Nov. 10, 2004.
Malik; Advisory Action mailed Feb. 28, 2007 for U.S. Appl. No. 10/985,361, filed Nov. 10, 2004.
Malik; Non-Final Rejection mailed Jun. 5, 2006 for U.S. Appl. No. 10/985,361, filed Nov. 10, 2004.
Malik; Non-Final Rejection mailed Jun. 19, 2007 for U.S. Appl. No. 10/985,361, filed Nov. 10, 2004.
Malik; Notice of Allowance and Fees Due mailed Jan. 11, 2008 for U.S. Appl. No. 10/985,361, filed Nov. 10, 2004.
Malik; U.S. Appl. No. 10/985,361, filed Nov. 10, 2004.
Malik; U.S. Appl. No. 12/115,004, filed May 5, 2008.
Adamczyk; Advisory Action mailed Dec. 31, 2008 for U.S. Appl. No. 10/745,199, filed Dec. 23, 2003.
Adamczyk; Final Rejection mailed Oct. 14, 2008 for U.S. Appl. No. 10/745,199, filed Dec. 23, 2003.
Adamczyk; Non-Final Rejection mailed Mar. 26, 2008 for U.S. Appl. No. 10/745,199, filed Dec. 23, 2003.
Adamczyk; Non-Final Rejection mailed Jun. 11, 2009 for U.S. Appl. No. 10/745,199, filed Dec. 23, 2003.
Adamczyk; U.S. Appl. No. 10/745,199, filed Dec. 23, 2003.
Malik; Examiner Interview Summary mailed Jan. 4, 2006 for U.S. Appl. No. 10/889,859, filed Jul. 13, 2004.
Malik; Examiner Interview Summary mailed Jun. 5, 2006 for U.S. Appl. No. 10/889,859, filed Jul. 13, 2004.
Malik; Examiner Interview Summary mailed Aug. 2, 2006 for U.S. Appl. No. 10/889,859, filed Jul. 13, 2004.
Malik; Examiner Interview Summary mailed Sep. 27, 2007 for U.S. Appl. No. 10/889,859, filed Jul. 13, 2004.
Malik; Final Rejection mailed Mar. 28, 2006 for U.S. Appl. No. 10/889,859, filed Jul. 13, 2004.
Malik; Final Rejection mailed Dec. 12, 2006 for U.S. Appl. No. 10/889,859, filed Jul. 13, 2004.
Malik; Non-Final Rejection mailed Apr. 9, 2007 for U.S. Appl. No. 10/889,859, filed Jul. 13, 2004.
Malik; Non-Final Rejection mailed Jun. 27, 2006 for U.S. Appl. No. 10/889,859, filed Jul. 13, 2004.
Malik; Non-Final Rejection mailed Nov. 4, 2005 for U.S. Appl. No. 10/889,859, filed Jul. 13, 2004.
Malik; Notice of Allowance and Fees Due mailed Sep. 27, 2007 for U.S. Appl. No. 10/889,859, filed Jul. 13, 2004.
Malik; U.S. Appl. No. 10/889,859, filed Jul. 13, 2004.
Malik; Non-Final Rejection mailed Oct. 1, 2008 for U.S. Appl. No. 12/017,999, filed Jan. 22, 2008.
Malik; U.S. Appl. No. 12/017,999, filed Jan. 22, 2008.

Nguyen; Non-Final Rejection mailed Mar. 9, 2009 for U.S. Appl. No. 11/524,668, filed Sep. 21, 2006.
Nguyen; Non-Final Rejection mailed Oct. 20, 2008 for U.S. Appl. No. 11/520,262, filed Sep. 13, 2006.
Nguyen; Notice of Allowance mailed Feb. 6, 2009 for U.S. Appl. No. 11/520,262, filed Sep. 13, 2006.
Nguyen; Notice of Allowance mailed Apr. 6, 2009 for U.S. Appl. No. 11/520,262, filed Sep. 13, 2006.
Nguyen; U.S. Appl. No. 11/520,262, filed Sep. 13, 2006.
Nguyen; Non-Final Rejection mailed Mar. 12, 2009 for U.S. Appl. No. 11/525,008, filed Sep. 21, 2006.
Daigle; Final Office Action mailed Apr. 10, 2009 for U.S. Appl. No. 11/304,319, filed Dec. 15, 2005.
Daigle; Interview Summary mailed Jun. 15, 2009 for U.S. Appl. No. 11/304,319, filed Dec. 15, 2005.
Daigle; Non-Final Rejection mailed Jul. 29, 2009 for U.S. Appl. No. 11/304,319, filed Dec. 15, 2005.
Daigle; Non-Final Rejection mailed Nov. 20, 2008 for U.S. Appl. No. 11/304,319, filed Dec. 15, 2005.
Daigle; U.S. Appl. No. 11/304,319, filed Dec. 15, 2005.
Daigle; Non-Final Rejection mailed Jul. 29, 2009 for U.S. Appl. No. 11/304,341, filed Dec. 15, 2005.
Newton; Telecom Dictionary; Definition of "Ack"; CMP books, 20th edition, p. 42.
Nguyen; Final Office Action mailed Sep. 3, 2009 for U.S. Appl. No. 11/524,668, filed Sep. 24, 2006.
Jensen; U.S. Appl. No. 12/535,062, filed Aug. 4, 2009.
Nguyen; U.S. Appl. No. 11/524,668, filed Sep. 21, 2006.
Nguyen; U.S. Appl. No. 11/525,008, filed Sep. 21, 2006.
Nguyen; Final Office Action mailed Sep. 15, 2009 for U.S. Appl. No. 11/525,008, filed Sep. 21, 2006.
Adamczyk; Final Office Action mailed Dec. 8, 2009 for U.S. Appl. No. 10/745,199, filed Dec. 23, 2003.
Nguyen; Non-Final Office Action mailed Jan. 20, 2011 for U.S. Appl. No. 11/524,668, filed Sep. 21, 2006.
Nguyen; Non-Final Office Action mailed Feb. 2, 2011 for U.S. Appl. No. 11/525,008, filed Sep. 21, 2006.
Holt; Non-Final Office Action mailed Sep. 15, 2010 for U.S. Appl. No. 12/133,590, filed Jun. 5, 2008.
Malik; Final Office Action mailed Nov. 9, 2010 for U.S. Appl. No. 12/059,320, filed Mar. 31, 2008.
Holt; Non-Final Office Action mailed Mar. 8, 2011 for U.S. Appl. No. 12/133,590, filed Jun. 5, 2008.

* cited by examiner

Petitioner ADT Exhibit 1001
1001.003



*MONITORING AND ENTRY*
*SYSTEM PRESENCE SERVICE*
*ARCHITECTURE*

*FIG. 1*

Petitioner ADT Exhibit 1001
1001.004



*EXAMPLE DOORBELL PRESENCE*
*SERVICE ARCHITECTURE*

## FIG. 2

Petitioner ADT Exhibit 1001
1001.005



*FIG. 3*

Petitioner ADT Exhibit 1001
1001.006



*EXAMPLE DOORBELL PRESENCE*
*SERVICE WITH IMS*
*ARCHITECTURE*

## FIG. 4

Petitioner ADT Exhibit 1001
1001.007



EXAMPLE DOORBELL
PRESENCE SERVICE

*FIG. 5*

Petitioner ADT Exhibit 1001
1001.008



*FIG. 6*

Petitioner ADT Exhibit 1001
1001.009



EXAMPLE DOORBELL
PRESENCE APPLICATION UI

FIG. 7

Petitioner ADT Exhibit 1001
1001.0010



*FIG. 8*

DOORBELL PRESENCE SERVICE:
EXAMPLE WATCHER ACTIONS

Petitioner ADT Exhibit 1001
1001.0011



*FIG. 9*

Petitioner ADT Exhibit 1001
1001.0012

US 7,956,739 B2

**1**

## MONITORING AND ENTRY SYSTEM PRESENCE SERVICE

### RELATED APPLICATIONS

The present application is a continuation of U.S. application Ser. No. 11/520,262, filed Sep. 13, 2006, which is incorporated by reference in its entirety. The present application is also related to U.S. application Ser. No. 11/520,131, filed Sep. 13, 2006.

### TECHNICAL FIELD

Embodiments are related to presence services. More particularly, the disclosed subject matter is related to computer-implemented methods, configurations, systems, and computer program products for facilitating integration of monitoring and entry systems with a presence service.

### BACKGROUND

With the proliferation and improvement of network communications and the Internet, security monitoring applications have begun to take advantage of networking capabilities. Many applications are available today, which allow users to access their monitoring system remotely through the Internet and perform actions such as configuring the system, receiving status updates, and the like.

Intelligent devices are increasingly popular in modern society. In addition, these devices whether cell phones, computers, or motion detectors are usually connected to a network such as the Internet. In this interconnected environment, the trend is to provide presence awareness information about almost anyone to almost anyone. "Buddy List" applications, which enable people to communicate and/or forward their incoming communications to their designees, are becoming common in cellular phone and instant messaging systems. For example, some cellular phone companies provide a service, where a calling party can be forwarded to the called person at any number. All the called person has to do, is provide a list of numbers where they can be reached. The system automatically searches for the called person until he or she is found and facilitates the connection.

### SUMMARY

Consistent with embodiments described herein, systems and methods are disclosed for providing a notification and interaction system integrated with a unified presence application interface. Key features or essential features of the claimed subject matter are not necessarily identified in this summary portion.

Embodiments are directed to a service and system that provides notification to a user in response to a trigger event at an interface device, such as a doorbell, an alarm monitor, and the like. The service may include an integrated unified presence system, which allows the user to be notified through one of a plurality of means. The user may be provided a selection of actions in response to the notification including, but not limited to, two-way communication, enabling entry to a premise, obtaining a video or image of a location of interest, and the like.

It is to be understood that both the foregoing general description and the following detailed description are exemplary and explanatory only, and should not be considered restrictive of the scope of the invention, as described and claimed. Further, features and/or variations may be provided

**2**

in addition to those set forth herein. For example, embodiments of the invention may be directed to various combinations and sub-combinations of the features described in the detailed description.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a diagram of a monitoring and entry system presence service architecture;

FIG. **2** illustrates an example doorbell presence service architecture where example embodiments may be implemented;

FIG. **3** illustrates main components of an IMS system architecture;

FIG. **4** illustrates the example doorbell presence service of FIG. **2** integrated with IMS architecture according to embodiments;

FIG. **5** illustrates a conceptual diagram of components of an example doorbell presence service;

FIG. **6** illustrates action flows in the example doorbell presence service of FIG. **2**;

FIG. **7** illustrates an example doorbell presence application UI;

FIG. **8** illustrates action flows in the example doorbell presence service of FIG. **2** based on various watcher selection scenarios; and

FIG. **9** illustrates a logic flow diagram for a process of providing doorbell presence service according to one embodiment.

### DETAILED DESCRIPTION

As briefly described above, a notification and interaction service may be provided with an integrated unified presence service. In the following detailed description, references are made to the accompanying drawings that form a part hereof, and in which are shown by way of illustrations specific embodiments or examples. These aspects may be combined, other aspects may be utilized, and structural changes may be made without departing from the spirit or scope of the present disclosure. The following detailed description is therefore not to be taken in a limiting sense, and the scope of the present invention is defined by the appended claims and their equivalents.

Referring now to the drawings, aspects, exemplary operating environments, and configurations will be described. While the embodiments will be described in the general context of program modules that execute in conjunction with an application program that runs on an operating system on a personal computer, those skilled in the art will recognize that aspects may also be implemented in combination with other program modules.

Embodiments may be implemented as a computer process (method), a computing system, or as an article of manufacture, such as a computer program product or computer readable media. The computer program product may be a computer storage media readable by a computer system and encoding a computer program of instructions for executing a computer process. The computer program product may also be a propagated signal on a carrier readable by a computing system and encoding a computer program of instructions for executing a computer process.

Generally, program modules include routines, programs, components, data structures, and other types of structures that perform particular tasks or implement particular abstract data types. Moreover, those skilled in the art will appreciate that embodiments may be practiced with other computer system

Petitioner ADT Exhibit 1001
1001.0013

US 7,956,739 B2

**3**

configurations, including hand-held devices, multiprocessor systems, microprocessor-based or programmable consumer electronics, minicomputers, mainframe computers, and the like. Embodiments may also be practiced in distributed computing environments where tasks are performed by remote processing devices that are linked through a communications network. In a distributed computing environment, program modules may be located in both local and remote memory storage devices.

With reference to FIG. **1**, a diagram of a monitoring and entry system presence service architecture is shown. Architecture **100** includes at a base level two kinds of physical devices: interface device **102** and device with watcher client application **104**. Interface device is typically a component of a monitoring or entry system configured to provide the triggering event(s). For example, interface device **102** may include a doorbell integrated with additional functionality or an alarm monitor device also integrated with additional functionality. Device with watcher client application **104** is used to provide the user with notification of the trigger event, present a selection of actions, and forward the user's selection to an application for execution of tasks associated with the selected action. In other embodiments, the user may be notified through one device and select actions to be performed through another device.

Connectivity and access layer **110** includes network infrastructure that is used to provide interconnection between devices **102**, **104** and applications at higher levels. Connectivity layer may include any network or combination of networks. These network(s) may include a secure network such as a home network or an enterprise network, or an unsecure network such as a wireless open network. The networks provide communication between the nodes described above. By way of example, and not limitation, the networks may include wired media such as a wired network or direct-wired connection, and wireless media such as acoustic, RF, infrared and other wireless media.

Control and session layer **120** is arranged to facilitate communication sessions between the physical devices and the applications, as well as between the applications and any network resources such as data stores. According to some embodiments, the control and session layer may be integrated with an IP Multimedia System (IMS) for providing a unified presence service.

Application layer **130** includes one or more applications associated with providing a notification and interaction service with an integrated unified presence service. Application layer **130** may include an application arranged to perform actions associated with the devices **102** and **104**, an application for providing the presence service, and even an application for providing a location service to determine a location of a user to be notified.

Interface device **102** and device with watcher client application **104** may include or may be part of a computing device. Computing devices typically include a processing device and a system memory. Computing devices may also include additional processing devices, which may be dedicated processors or enable distributed processing by coordinating with a main processing device. The system memory may be volatile (such as RAM), non-volatile (such as ROM, flash memory, etc.) or some combination of the two. System memory typically provides an environment for an operating system to be executed for controlling the operation of computing device **100** and execution of other programs (applications). Watcher client application, two-way communication applications, imaging or video communication applications are examples of programs or program modules that may be executed in the sys-

**4**

tem memory. These applications may be an integrated part of a single program or separate applications. They may communicate with other applications running on the computing device or on other devices.

The computing devices may have additional features or functionality. For example, the computing devices may also include data storage devices (removable and/or non-removable) such as, for example, magnetic disks, optical disks, or tape. Computer storage media may include volatile and nonvolatile, removable and non-removable media implemented in any method or technology for storage of information, such as computer readable instructions, data structures, program modules, or other data. The system memory and storage devices are examples of computer storage media. Computer storage media includes, but is not limited to, RAM, ROM, EEPROM, flash memory or other memory technology, CD-ROM, digital versatile disks (DVD) or other optical storage, magnetic cassettes, magnetic tape, magnetic disk storage or other magnetic storage devices, or any other medium which can be used to store the desired information and which can be accessed by the computing device. Any such computer storage media may be part of the computing device.

Computing devices may also include input devices such as a keyboard, a keypad, a voice input device, a touch input device, a camera etc. Furthermore, output devices such as a display, a speaker, a printer, etc. may also be included. These devices are well known in the art.

Communication connections may be included in the computing devices to allow the device to communicate with other computing devices executing above described applications, such as over a network in a distributed computing environment, for example, an intranet or the Internet. Communication connections may include media that may be embodied by computer readable instructions, data structures, program modules, or other data in a modulated data signal, such as a carrier wave or other transport mechanism, and include any information delivery media.

By way of example, and not limitation, communication media may include wired media such as a wired network or direct-wired connection, and wireless media such as acoustic, RF, infrared and other wireless media. The term computer readable media as used herein refers to both storage media and communication media. Communication media is employed to provide interconnection between interface device **102**, device with watcher client application **104** and networks of connectivity and access layer **110**.

The implementation of embodiments for interface device **102** and device with watcher client application **104** is not limited to the computing devices described above. Other computing devices with different components, configurations, and the like, may be used to execute computer readable instructions implementing embodiments described herein without departing from a scope and spirit of the claimed subject matter.

FIG. **2** and the following discussion are intended to provide a brief, general description of a suitable computing environment in which the invention may be implemented. Referring to FIG. **2**, an example doorbell presence service architecture, where example embodiments may be implemented, is illustrated. Architecture **200** may include at various layers any topology of servers, clients, Internet service providers, and communication media. Applications such as doorbell application **232** and location service **236** may be one or more programs or a server machine executing programs associated with the server tasks. Client devices and servers may be embodied as single device (or program) or a number of

Petitioner ADT Exhibit 1001
1001.0014

US 7,956,739 B2

**5**

devices (programs). Similarly, data sources may include one or more data stores, input devices, and the like.

Interface device **102** and device with watcher client application **104** of FIG. **1** are exemplified in FIG. **2** as doorbell **202** with additional functionality and handheld computing device **204**, such as a smartphone, a PDA, and the like. In response to the doorbell being rung, a notification is sent by the doorbell **202** to other network **214** of connectivity and access layer **110**. Connectivity and access layer **110** may include one or more networks. For example, a wired or wireless access network may be employed to establish communication with the doorbell and an IP network may be utilized to facilitate communication with computing device **204**. The IP network may further be used to facilitate communications between the various applications of application layer **130**. As mentioned previously, the networks of the connectivity and access layer may include secure, open, wired, wireless networks of any type including the Internet.

Control and session layer **120** manages communication sessions between the physical devices, client applications executed on the physical devices and the application of the application layer **130**. Moreover, control and session layer **120** may include resources such as data stores that enable operation of the applications of the application layer. While embodiments may be implemented with any type of control and session layer, an IMS example is provided in the following two figures.

Applications layer **130** includes doorbell application **232**, presence server **234**, and optional location service **236**. As mentioned above, these applications may be executed on a single machine or on separate machines. Doorbell application **232** is configured to receive notification from doorbell **202**, communicate with presence server **234** and optional location service **236** to determine a location and reach the user through computing device **204**, and perform tasks for execution of action(s) selected by the user.

Presence server **234** is arranged to provide an indicator that the doorbell has been pressed and present various alternative actions to take to the user (e.g. resident). The actions may include initiating a VoIP conversation between the owner and the doorbell, requesting a digital image of the visitor, requesting a video image of the visitor, or ignoring the doorbell message. Optional location service **236** is arranged to determine a location of the user and provide it to doorbell application **232** such that communication with the user can be established. A number of other applications may also be configured, deployed, and shared in application layer **130**.

According to some embodiments, one or more user interfaces ("UIs") may be provided in computing device **204** and doorbell **202** to enable the user and the person at the door to receive and provide information, such as action selections, alphanumeric entries, and the like. While a doorbell application has been described above as an example embodiment, other applications such as an alarm system with imaging functionality may also be implemented using the principles described herein. For example, a car alarm equipped with a camera may notify the owner if the car is being tempered with. Upon being notified by the monitoring system with integrated presence service, the owner may instruct the alarm to obtain one or more images, which are subsequently stored and/or forwarded to the owner.

Now referring to FIG. **3**, main components of an IMS system architecture are illustrated. IMS control and session layer includes a number of functions and a data store service. IMS is an open-systems architecture that supports a range of

**6**

IP-based services over both packet switch and circuit switch networks, employing both wireless and fixed access technologies.

IMS provides services and control such as adding call session control to the packet network, enabling peer-to-peer real-time services such as voice or video over a packet-switched domain, and scalable common service control (based on SIP) for giving the ability to manage parallel user services. In a mixed multimedia environment, IMS may provide the ability to pick and mix various multimedia flows in single or multiple sessions and can handle real-time voice, video, and data. IMS also provides access to IP based services independent of the underlying access technology (mobile or fixed). IMS applications and drivers may include voice telephony (VoIP), video telephony, web browsing, presence-based services, push-to media services (e.g. push-to-talk, push-to-view, push-to-video, etc.), group chat, instant messaging, multimedia conferencing, content sharing/data transfer, and the like.

Still referring to FIG. **3**, P-CSCF **322** is proxy call state control function, which is typically a first point of contact. It may provide privacy control, quality of service (QoS), authorization of local services, and similar functionalities. In the example architecture of FIG. **2**, P-CSCF **322** may interact with computing device **104** using a Session Initiation Protocol (SIP). P-CSCF **322** interacts through SIP with I-CSCF **324** (interrogating call state control function), which may provide an access point functionality to the network and enable protection of a topology and configuration of the network. I-CSCF **324** interacts through SIP with S-CSCF **326** (serving call state control function), which provides session control services such as registration, accounting, and the like.

Both I-CSCF **324** and S-CSCF **326** interact with HSS **328** (home subscriber service), which is essentially a data store service for storing presence information (e.g. where the user can be reached). HSS **328** may be embodied as one or more data stores that may be managed by a data server. In addition, I-CSCF **324** may interact with SLF **342** (subscriber location function). SLF **342** may be an interface function for the optional location service **236** of architecture **200**.

S-CSCF **326** also interacts with application server **344**, which represents any server that includes applications of the application layer such as doorbell application **232** or presence service **234** of FIG. **2**. An IMS architecture may include additional components such as a trunking signaling gateway, a media resource function controller, and the like. A basic configuration is illustrated here to describe interactions between a system according to embodiments and an IMS framework.

FIG. **4** illustrates the example doorbell presence service of FIG. **2** integrated with IMS architecture according to embodiments. The interactions in architecture **400** begin, as in architecture **200**, with a button on doorbell **202** being pressed. The doorbell may be an IMS device with a profile in the IMS HSS component. The initial filter criteria in the IMS HSS may point to the doorbell presence service (doorbell application **232** and presence service **234**). Notification is forwarded through wireline/wireless network **214** of connectivity and access layer **110** to IMS control and session layer **120**. For the IMS session(s), the doorbell may register with P-CSCF **422** and I-CSCF **424**. S-CSCF **426** may then initiate the IMS session based communications with doorbell application **232** and presence service **234**. The communications may be facilitated through SIP messaging using IMS sessions. Doorbell application **232** determines a location of the user (resident) and notifies presence service **234**, which may update presence information on HSS **428**. Subsequently, the user is provided

Petitioner ADT Exhibit 1001
1001.0015

**APPX00152**

US 7,956,739 B2

**7**

with the notification and a list of actions to be selected in response through a client application (watcher client application) on computing device **204**.

The user may make selections including, but not limited to, initiating a VoIP conversation with the person at the door, initiating a video conference with the person at the door, obtain a still image or video of the person at the door, provide one of a plurality of "canned" messages to the person at the door, alert a monitoring service and the like. While performing these actions, the user may be in a remote location and access the system through another network such as the Internet.

FIG. **5** illustrates a conceptual diagram of components of an example doorbell presence service. The doorbell presence service is a network based service that receives messages from a residence whenever the doorbell is pressed. Diagram **500** summarizes the interactions described in FIG. **2** and FIG. **4**. According to diagram **500**, doorbell presence hardware **502** initiates a session by providing a notification to doorbell presence application **532** that someone is at the door. Doorbell presence application **532** may optionally determine a location of the resident using location service **236** and provide aggregate presence service **534** with the user's location and the notification. Aggregate presence service **534** updates a presentity store **528** and enables watcher client application **504** to provide the notification to the user. Watcher client application also provides a list of actions to be selected by the user. Once the user selects and action, aggregate presence service **534** facilitates the execution of tasks associated with the selected action in coordination with doorbell presence application **532** and any client applications that may be executed on the doorbell presence hardware **502** or computing devices in communication with the doorbell presence hardware **502**.

The architecture and scenarios described in FIGS. **1** through **5** are for illustration purposes only and do not constitute a limitation on embodiments. Other configurations of a monitoring and entry system with presence service may be implemented without departing from a scope and spirit of the present invention.

FIG. **6** illustrates action flows in the example doorbell presence service of FIG. **2**. The interactions are between components the doorbell presence service described above in detail.

The action flow begins with doorbell presence hardware **502** initiating a registration process with the IMS control layer **620** in response to the doorbell being rung. The IMS control layer establishes a session for the doorbell using SIP messaging and retrieves filter criteria for the doorbell from HSS **528**, where a profile for the doorbell is stored.

The IMS control layer **620** then sends notice to doorbell presence application **532** that the doorbell has been rung. Although not shown, doorbell presence application **532** may determine a location of the resident using a location service. Doorbell presence application **532** then updates aggregate presence service **534** with the current location of the resident and the received notice. Aggregate presence service **534**, in response, updates a doorbell presence indicator on watcher client application such as an icon, an LED indicator, and the like. Aggregate presence service may also update a presentity store with the information about the resident's current location.

FIG. **7** illustrates an example doorbell presence application UI. UI **700** may be part of a watcher client application executed on a user device such as computing device **504**. According to some embodiments, the user may be notified and presented with actions to select, as well as the actions executed using the same computing device. In other embodi-

**8**

ments, any combinations of the above described events may be presented using separate computing devices.

UI **700** may include additional functionality such as phone service, instant message service, email service, and the like, as shown with icons **752**. Different tabs may be provided for various aspects of the UI such as tab **754** (Preferences) for configuration changes, tab **756** (Logs) for recorded information. For a doorbell presence service, the UI may provide different indicators for different entry points such as front door **766** and back door **768**. The notification that someone is at the door may be provided by changing a color of the indicator icon to the left of the location designator or the designator itself. Other methods such as flashing the designator, highlighting the designator, and the like, may also be used. Another icon to the right of the location designator indicates the presence of a doorbell presence hardware at the designated location.

Next, a number of icons (**758**, **760**, **762**, and **764**) next to each location designator show available actions for that location. For example, both the back door **768** an front door **766** are equipped with doorbell presence hardware capable of establishing VoIP call (icon **764**), taking picture (icon **760**), and obtaining a video of the visitor (icon **758**). A watcher client application and its associated UI(s) may of course include fewer or additional functions and present them in other configurations including, but not limited to, drop down menus, panes, separate view screens, and the like.

FIG. **8** illustrates action flows in the example doorbell presence service of FIG. **2** based on various watcher selection scenarios. The actions shown in FIG. **8** begin after the resident has received notification about the doorbell being rung and has been presented with a number of actions to select from. As mentioned previously, the actions may include a number of responses depending on capabilities of the system. Three example scenarios and action groups are provided here for illustration purposes.

According to first scenario **892**, watcher client application **504** requests a VoIP session with the visitor at the door. The request is forwarded to VoIP service **872**, which calls doorbell client VoIP application **874**. Doorbell client VoIP application **874** may reside in doorbell presence hardware or may be executed in a computing device associated with the doorbell presence hardware. In response to the call, doorbell client VoIP application **874** may provide an auto-answer establishing VoIP call between the resident and the visitor at the door.

According to a second scenario **894**, watcher client application **504** requests a video of the visitor at the door. The request is forwarded to doorbell multimedia application **876**, which requests the video from doorbell video client application **878**. Doorbell video client application **878** may also reside in doorbell presence hardware or may be executed in a computing device associated with the doorbell presence hardware. In response to the request, doorbell video client application **878** begins recording the video and providing it to doorbell multimedia application **876**, which in turn forwards the video to watcher client application **504**. In other embodiments, a video call may be established using the same or additional components.

According to a third scenario **896**, watcher client application **504** requests a picture of the visitor at the door. The request is forwarded to doorbell multimedia application **876**, which requests the picture from doorbell picture client application **880**. Doorbell picture client application **880** may also reside in doorbell presence hardware or may be executed in a computing device associated with the doorbell presence hardware. In response to the request, doorbell picture client application **880** may take a still image of the visitor and provide it

Petitioner ADT Exhibit 1001
1001.0016

US 7,956,739 B2

**9**

to doorbell multimedia application **876**, which in turn forwards the picture to watcher client application **504**. Two or more of the above described scenarios along with others may also be executed simultaneously.

The claimed subject matter also includes methods. These methods can be implemented in any number of ways, including the structures described in this document. One such way is by machine operations, of devices of the type described in this document.

Another optional way is for one or more of the individual operations of the methods to be performed in conjunction with one or more human operators performing some. These human operators need not be collocated with each other, but each can be only with a machine that performs a portion of the program.

FIG. **9** illustrates a logic flow diagram for a process of providing doorbell presence service according to one embodiment. Process **900** may be implemented in doorbell presence application **232**.

Process **900** begins with operation **902**, where doorbell application **232** receives an indication signal that someone is at the door through an established IMS session. The session may be established using SIP messaging over an IP network. Processing moves from operation **902** to operation **904**.

At operation **904**, the doorbell application **232** determines a current location of the resident using a location service. Processing moves from operation **904** to decision operation **906**.

At decision operation **906**, a determination is made whether the location is determined. If the location is not determined, the resident may not be reachable. In that case, processing moves to operation **908**. Otherwise, processing advances from decision operation **906** to operation **910**.

At operation **908**, the doorbell application facilitates execution of a default action. A default action may include providing the person at the door a "canned" message, upon receiving a security code allowing entry, and the like. After operation **908**, processing moves to a calling process for further actions.

At operation **910** following an affirmative determination at decision operation **906**, the doorbell application **232** provides an aggregate presence service with the notification and the current location of the resident. The current location of the resident may also be used to determine a method and device to be used in contacting the resident. Processing advances from operation **910** to operation **912**.

At operation **912**, aggregate presence service **234** notifies the resident that there is someone at the door and provided a list of actions that may be taken in response to the notification. As mentioned before, the actions may include initiating a voice or video conversation, obtaining a still or video image, alerting a monitoring service, and the like. Processing moves from operation **912** to operation **914**.

At operation **914**, the aggregate presence service receives the user's selection among the presented actions through a client application. Processing advances from operation **914** to operation **916**.

At operation **916**, the aggregate presence service in coordination with doorbell application **232** facilitates the selected action. The action may require activation of another client application(s) that may reside in or interact with the doorbell presence application hardware. After operation **916**, processing moves to a calling process for further actions.

The operations included in process **900** are for illustration purposes. Providing doorbell presence service may be imple-

**10**

mented by similar processes with fewer or additional steps, as well as in different order of operations using the principles described herein.

The above specification, examples and data provide a complete description of the manufacture and use of the composition of the embodiments. Although the subject matter has been described in language specific to structural features and/or methodological acts, it is to be understood that the subject matter defined in the appended claims is not necessarily limited to the specific features or acts described above. Rather, the specific features and acts described above are disclosed as example forms of implementing the claims and embodiments.

What is claimed is:

**1**. A method for providing distributed access services between a watcher and at least one personal presentity, the method comprising:

receiving, at a computing device, an alert from a personal presentity;

determining a current location of the watcher;

providing a notification associated with the alert to the watcher; and

storing data related to a current location of the watcher.

**2**. The method of claim **1**, further comprising:

providing the watcher a plurality of actions to select in response to the alert.

**3**. The method of claim **2**, further comprising:

activating an application in response to a selection by the watcher, wherein the application includes at least one of: a voice communication through the personal presentity, a video communication through the personal presentity, an image acquisition application, and an electronic control application.

**4**. The method of claim **3**, further comprising:

providing the notification and receiving the watcher selection through at least one Session Initiation Protocol (SIP) session using an IP Multi Media System (IMS) infrastructure.

**5**. The method of claim **3**, wherein the voice communication is established employing a Voice over IP (VoIP) network.

**6**. The method of claim **1**, wherein the personal presentity includes at least one of: a building entry system, a security monitoring system, and an equipment monitoring system.

**7**. The method of claim **1**, further comprising:

if the watcher is not available, performing at least one of the following: providing a notification associated with the alert to another watcher and executing a predetermined response action.

**8**. A computer-readable storage medium storing computer executable instructions for providing a monitoring and entry system presence service, the instructions configured to perform at least the following:

in response to a trigger event, receiving an indication signal from an interface device;

determining a current location of a user;

providing the user a notification associated with the trigger event; and

activating an application associated with the monitoring and entry system presence service.

**9**. The computer-readable storage medium of claim **8**, wherein the instructions further comprise:

selecting a client application and a client device to provide the notification and to present the plurality of actions to the user based on the current location of the user.

**10**. The computer-readable storage medium of claim **9**, wherein the user is a watcher and the client device is a personal presentity.

Petitioner ADT Exhibit 1001
1001.0017

US 7,956,739 B2

| 11 | 12 |

**11**. The computer-readable storage medium of claim **10**, wherein the application includes at least one of: a voice communication through the personal presentity, a video communication through the personal presentity, an image acquisition application, and an electronic control application.

**12**. A system for providing distributed access services between a watcher and a personal presentity, comprising:

an interface device configured to:

provide a notification associated with the trigger event, wherein the interface device acts as the personal presentity; and

a presentity application configured cause the system to:

determine a current location of the watcher;

provide the current location of the watcher to an aggregate presence service; and

in response to receiving a watcher selection from the aggregate presence service, facilitate execution of the selected action by activating at least one of a plurality of client applications associated with the personal presentity.

**13**. The system of claim **12**, wherein the presentity application is a doorbell presence application and the personal presentity is a doorbell presence hardware.

**14**. The system of claim **13**, wherein the doorbell presence application is further configured to cause the system to perform at least the following:

manage at least one from a set of: a VoIP call between the watcher and a person using the doorbell presence hardware, a capture of a still image of the person, a capture of a video of the person, and a control mechanism activation by activating one of the plurality of client applications associated with the doorbell presence hardware.

**15**. The system of claim **13**, wherein the doorbell presence application is configured to cause the system to communicate with the aggregate presence service and the plurality of client applications through one or more SIP sessions using the IMS infrastructure.

**16**. The system of claim **13**, wherein the doorbell presence application is further configured to cause the system to register and update a profile associated with the doorbell presence hardware in a home subscriber service component of the IMS infrastructure.

**17**. The system of claim **12**, wherein the personal presentity is a monitoring device configured to capture an image of a monitored location in response to a selection by the watcher, and wherein the presentity application is a monitoring presence application configured to manage notification of the watcher and delivery of the captured image to the watcher.

\* \* \* \* \*

Petitioner ADT Exhibit 1001
1001.0018

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.         : 7,956,739 B2

APPLICATION NO.   : 12/483306

DATED             : June 7, 2011

INVENTOR(S)       : Hong Thi Nguyen et al.

Page 1 of 1

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title Page, Item (12) delete "Hong" and insert --Nguyen--.

Item (75), please delete "Nguyen Thi Hong," and insert --Hong Thi Nguyen,--.

Item (75), please delete "Denny Sean Michael," and insert --Michael Sean Denny,--.

Signed and Sealed this
Twenty-sixth Day of March, 2013

Teresa Stanek Rea
*Acting Director of the United States Patent and Trademark Office*

Petitioner ADT Exhibit 1001
1001.0019